NO. 4-01-0801

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

PRAIRIE RIVERS NETWORK,

Petitioner,

v.

THE ILLINOIS POLLUTION CONTROL BOARD; THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY; and BLACK BEAUTY COAL COMPANY,

Respondents.

)

)

)

)

)

)

)

)

Administrative

Review of the Illinois Pollution

Control Board

No. 01112.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In December 2000, respondent, the Illinois Environmental Protection Agency (IEPA or agency), issued a final National Pollutant Discharge Elimination System (NPDES) permit to respondent Black Beauty Coal Company (Black Beauty).  In January 2001, petitioner, Prairie Rivers Network (Prairie Rivers), a river conservation group, filed a petition with respondent, the Illinois Pollution Control Board (Board), requesting that the Board set aside the final NPDES permit issued to Black Beauty.  In August 2001, the Board denied Prairie Rivers' petition and affirmed the IEPA's issuance of the final permit.

Prairie Rivers appeals, arguing that the Board erred by denying Prairie Rivers' petition because (1) the IEPA failed to provide it with a meaningful opportunity to participate in the final NPDES permit-writing process; (2) the final permit did not include certain required conditions; and (3) the IEPA improperly relied on documents produced by Black Beauty after the public comment period.  We affirm.  

I. BACKGROUND

Vermilion Grove Mine is a new coal mine located a few miles southeast of Georgetown, Illinois.  Black Beauty leases the Vermilion Grove Mine from Vermilion Coal.  In May 2000, the IEPA received Black Beauty's "Application for Surface Coal Mining and Reclamation Operations Permit," in which Black Beauty sought an NPDES permit to discharge groundwater and storm water into an unnamed tributary of the Little Vermilion River.  Black Beauty's plans showed that it intended to (1) drill a hole in the ground to establish the mine entrance, (2) create air shafts for ventilation, (3) establish sediment basins to control drainage in the disturbed areas, and (4) build a preparation plant, a rail loop and load-out facility, and an office building.  According to the plan, the coal would be moved by conveyors from the underground mine to a processing area, where it would be cleaned, screened, and crushed.  All storm water runoff from the mine would be collected into three connected basins (designated as "003," "003A," and "003B").  In the event that the basin system reached its capacity due to heavy rainfall, the water that could not be held in the basins would be diverted through a discharge point (outfall 003) into the unnamed tributary.     

On August 4, 2000, the IEPA issued a public notice, pursuant to section 309.109 of Title 35 of the Illinois Administrative Code (Code) (35 Ill. Adm. Code §309.109 (Conway Greene CD-ROM June 2002)), that after reviewing Black Beauty's application, the agency had tentatively decided to issue Black Beauty an NPDES permit.  The public notice also included a copy of the draft NPDES permit.  

Although the United States Environmental Protection Agency (US EPA) has generally waived its right to review NPDES permits issued by the IEPA to coal mine operators, on August 29, 2000, the US EPA exercised its preemptive rights under section 123.44(a)(1) of the Code of Federal Regulations (40 C.F.R. §123.44(a)(1) (2000)) and requested 90 days to review the draft permit.    

Based on the degree of public interest in its tentative decision, the IEPA determined that a public hearing was required under section 309.115 of Title 35 of the Code (35 Ill. Adm. Code §309.115 (Conway Greene CD-ROM June 2002)).  On September 20, 2000, the agency and the Illinois Department of Natural Resources conducted a public meeting at Georgetown-Ridge Farm High School to inform the public about the proposed permit and prepare those citizens who planned on participating in the subsequent public hearing.  On September 27, 2000, a public hearing on the draft permit was held at the Georgetown-Ridge Farm High School.  Prairie Rivers attended and participated in both the public meeting and the hearing.

On October 6, 2000, in response to concerns raised at the public hearing and other comments on the draft permit, an IEPA employee asked Black Beauty to provide the agency with additional information regarding the permit.  In response, Black Beauty hired a consultant, Advent Group, Inc. (Advent), to perform a study and prepare a report.  On October 20, 2000, Advent issued its report, in which Advent's scientists concluded that the anticipated infrequent discharge through outfall 003, which would only occur during significant rainfall, would not harm the environment.  

The public comment period on the IEPA's tentative decision closed on October 27, 2000.  During the public comment period, several agencies and groups submitted comments regarding the IEPA's tentative decision and suggested changes to the draft NPDES permit.  On October 27, 2000, Prairie Rivers submitted comments that criticized the draft permit and advocated for stringent monitoring conditions. 

On October 30, 2000, the US EPA objected to the draft NPDES permit.  The IEPA considered all input and suggested changes to the draft permit, discussed and reached a consensus with the US EPA, and developed a final NPDES permit.  On December 22, 2000, the US EPA withdrew its objection to the draft permit and approved the final permit.  On December 27, 2000, the IEPA issued the final permit and issued a public notice of its decision and a responsive summary, which addressed all concerns raised by citizens and organizations, including Prairie Rivers and the US EPA.  

The final NPDES permit issued to Black Beauty was generally more restrictive and contained more conditions than the draft permit.  In particular, the final permit included the following changes:  (1) the effluent limitation for sulfate was reduced to a more restrictive level (1,000 milligrams per liter, as compared to the previous 3,500 milligrams per liter); (2) the potential for Black Beauty to avoid sulfate and chloride monitoring was eliminated; (3) discharge monitoring requirements were increased from one sample per storm water discharge event (with a total requirement of three per quarter), to daily monitoring of all storm water discharge events; (4) all references to mine discharges being exempt from water quality standards were removed; (5) additional sedimentation pond operation and maintenance restrictions were included; and (6) biological inventory and water quality monitoring of the Little Vermilion River and the unnamed tributary were added.  

In January 2001, Prairie Rivers filed a petition with the Board, requesting that the Board set aside the final NPDES permit issued to Black Beauty.  In that petition, Prairie Rivers alleged the following:  (1) during the September 27, 2000, public hearing and during the public comment period, Prairie Rivers and its members identified legal and scientific flaws in the draft NPDES permit; (2) the final permit contained "certain conditions and limits that were not contained in the draft permit that was subject to public review"; (3) the final permit contained "most of the defects that were identified by [Prairie Rivers] in the draft permit"; (4) the final permit contained ambiguous provisions regarding monitoring and no operation plan was set forth regarding how provisions related to precipitation events would be implemented or enforced; (5) a proper antidegradation analysis had not been completed; and (6) Prairie Rivers' members "will be affected adversely when pollution discharged under the permit injures the ecology of the Little Vermilion watershed as a result of [the IEPA's] failure to require protective effluent limits, monitoring, antidegradation analysis and mixing zone delineation."

In May 2001, the Board conducted a hearing, at which the parties introduced evidence and presented oral argument.  In addition, members of the public provided comments both during and after the hearing.  Following the hearing, the parties submitted written briefs.  In August 2001, the Board denied Prairie Rivers' petition and affirmed the IEPA's issuance of the final NPDES permit to Black Beauty.  

In September 2001, Prairie Rivers filed a notice of appeal.  This court has allowed the Illinois Environmental Regulatory Group and the Vermilion Coal Company to file briefs as 
amici
 
curiae
.        

II. ANALYSIS

A. The Illinois NPDES Permit Program

"The history and goals of the Federal Water Pollution Control Act [(Clean Water Act)] and its amendments have been chronicled in numerous judicial opinions.  
See, e.g.,
 
American Frozen Food Inst. v. Train
, 176 U.S. App. D.C. 105, 111-22, 539 F.2d 107, 113-24 (1976); 
California v. EPA
, 511 F.2d 963 (9th Cir. 1975).  Congress' ultimate objective was 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,' [(33 U.S.C. §1251(a) (1976))], and it established a permit program, the NPDES, to achieve this goal.  Under this program, any pollutant discharge into navigable waters without [a US] EPA authorization permit is banned, and the [US] EPA was instructed to make the pollution controls inherent in its permits increasingly stringent over time.

Although the administration and enforcement of the permit program initially was vested entirely in the [US] EPA, Congress intended that much of this authority would devolve to the states.  [33 U.S.C. §1251(b) (Supp. I 1977).]  The Clean Water Act stipulates that any time after the promulgation of [US] EPA guidelines establishing the minimum elements of state permit programs, a state may submit a description of a proposed program, along with a statement from the state attorney general that state law provides adequate authority to carry out the program, for evaluation by the Administrator of the [US] EPA.  If the state program satisfies the statutory requirements of section 402(b), 33 U.S.C. § 1342(b), and the guidelines issued under section 304(i), 33 U.S.C. § 1314(i), the Administrator must approve the program.  The state would then assume primary responsibility for the issuance of permits and for the administration and enforcement of the NPDES program within its jurisdiction."  
Citizens for a Better Environment v. Environmental Protection Agency
, 596 F.2d 720, 721-22 (7th Cir. 1979).  

In October 1977, the US EPA administrator approved Illinois's proposal to administer the NPDES program within Illinois.  In 
Citizens for a Better Environment
, 596 F.2d at 724, the Seventh Circuit Court of Appeals invalidated the administrator's approval of the Illinois NPDES permit program, on the ground that the US EPA had failed to promulgate regulations providing for public participation in state enforcement actions.  In response, the US EPA promulgated such a regulation (40 C.F.R. §123.27(d) (2000)), and Illinois later agreed to abide by it.  In April 1981, the US EPA approved the revision to Illinois's NPDES program (46 Fed. Reg. 24295-02 (1981)).   

Subpart A of part 309 of Title 35 of the Code, which was enacted by the Board (see 
In re NPDES Regulations
, 14 PCB 661 (Ill. Pollution Control Board, December 5, 1974)), specifies that the IEPA must issue NPDES permits using the following procedures.  See 415 ILCS 5/13(b)(1) (West 2000) ("the Board shall adopt *** [r]equirements, standards, and procedures which *** are necessary or appropriate to enable the State of Illinois to implement and participate in the [NPDES]").   First, a party seeking an NPDES permit must file an application with the IEPA (35 Ill. Adm. Code §309.103 (Conway Greene CD-ROM June 2002)).  If the application is complete, the IEPA prepares a tentative determination regarding the application, and if the agency intends to issue the permit, prepares a draft permit (35 Ill. Adm. Code §309.108 (2000)).  

Second, the IEPA must issue a public notice of the permit application and the agency's tentative determination to issue or deny the permit (35 Ill. Adm. Code §309.109 (Conway Greene CD-ROM June 2002)).  This notice must provide for a period of not less than 30 days for persons to submit public comments on the agency's tentative determination and, where applicable, on the draft permit.  See 35 Ill. Adm. Code §309.109(b) (Conway Greene CD-ROM June 2002) ("All comments shall be submitted to the [a]gency and to the applicant" and "shall be retained by the [a]gency and considered in the formulation of its final determinations with respect to the NPDES application").  The IEPA also must provide notice of the permit application to other governmental agencies (35 Ill. Adm. Code §309.114 (Conway Greene CD-ROM June 2002)).

Third, if the IEPA determines that "there exists a significant degree of public interest in the proposed permit," the agency "shall hold a public hearing on the issuance or denial" of the permit (35 Ill. Adm. Code §309.115(a) (Conway Greene CD-ROM June 2002)).  "Following the public hearing, 
the
 
[a]gency
 
may
 
make
 
such
 
modifications
 
in
 
the
 
terms
 
and
 
conditions
 
of
 
proposed
 
permits
 
as
 
may
 
be
 
appropriate
."  (Emphasis added.)  35 Ill. Adm. Code §309.119 (Conway Greene CD-ROM June 2002).  The IEPA must "transmit to the [r]egional [a]dministrator [of the US EPA] for his approval a copy of the permit proposed to be issued unless the [r]egional [a]dministrator has waived his right to receive and review permits of its class."  35 Ill. Adm. Code §309.119 (Conway Greene CD-ROM June 2002).  The IEPA also must 

"provide a notice of such transmission to the applicant, to any person who participates in the public hearing, to any person who requested a public hearing, and to appropriate persons on the mailing list established under [s]ections 309.109 through 309.112.  Such notice shall briefly indicate 
any
 
significant
 
changes
 which were made from terms and conditions set forth in the draft permit."  (Emphasis added.)  35 Ill. Adm. Code §309.119 (Conway Greene CD-ROM June 2002).

In addition, the IEPA must issue a responsiveness summary, addressing comments made during the public hearing.  35 Ill. Adm. Code §166.192 (Conway Greene CD-ROM June 2002).  

If the IEPA does not hold a public hearing after the close of the comment period, the agency must, "after evaluation of any comments which may have been received, either issue or deny the permit."  35 Ill. Adm. Code §309.112 (Conway Greene CD-ROM June 2002).  

B. Standard of Review

The issues raised on appeal relate to the interpretation of statutes and administrative rules. 

"In cases involving the interpretation of a statute by an agency charged with administering it, the agency's interpretation is afforded considerable deference, but it is not binding on the court and will be rejected if erroneous.  [Citation.]  The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature.  [Citations.]  The words of a statute are given their plain and commonly understood meanings.  [Citation.]  Only when the meaning of the enactment is unclear from the statutory language will the court look beyond the language and resort to aids for construction." 
 
R.L. Polk & Co. v. Ryan
, 296 Ill. App. 3d 132, 139-40, 694 N.E.2d 1027, 1033 (1998).  

See also 
Gem Electronics of Monmouth, Inc. v. Department of Revenue
, 183 Ill. 2d 470, 475, 702 N.E.2d 529, 532 (1998) ("A court should not depart from the language of the statute by reading into it exceptions, limitations[,] or conditions that conflict with the intent of the legislature").

C. Burden of Proof in a Third-Party Appeal before the Board

Prairie Rivers first argues that the Board misapplied the burden of proof.  Prairie Rivers concedes that the Board properly considered the burden of proof to lie with Prairie Rivers on substantive matters; however, Prairie Rivers claims that to the extent the Board held it to that standard regarding its procedural claims, the Board erred.  We conclude that the Board properly determined that Prairie Rivers had the burden of proof in its third-party appeal before the Board.

Section 40(e) of the Illinois Environmental Protection Act (Act) provides, in pertinent part, as follows:

"(1) If the [a]gency grants or denies a permit under subsection (b) of [s]ection 39 of this Act, a third party, other than the permit applicant or [a]gency, may petition the Board within 35 days from the date of issuance of the [a]gency's decision, for a hearing to contest the decision of the [a]gency.

* * *

(3) If the Board determines that the petition is not duplicitous or frivolous and contains a satisfactory demonstration under subdivision (2) of this subsection, the Board shall hear the petition (i) in accordance with the terms of subsection (a) of this [s]ection and its procedural rules governing permit denial appeals and (ii) exclusively on the basis of the record before the [a]gency.  
The
 
burden
 
of
 
proof
 
shall
 
be
 
on
 
the
 
petitioner
.  The [a]gency and permit applicant shall be named co[]respondents."  (Emphasis added.)  415 ILCS 5/40(e) (West 2000).   

As earlier discussed, the cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent.  The best evidence of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning.  In construing a statute, a court is not at liberty to depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express.  
Lulay v. Lulay
, 193 Ill. 2d 455, 466, 739 N.E.2d 521, 527 (2000).

Section 40(e)(3) of the Act clearly provides that in a third-party appeal, the burden of proof lies with the petitioner --in this case, Prairie Rivers.  When a petitioner in a permit appeal is the permit applicant, the petitioner has the burden of proving that the requested permit would not violate the Act or the Board's regulations.  
Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board
, 179 Ill. App. 3d 598, 601, 534 N.E.2d 616, 619 (1989).  The scope of this burden does not change when the petitioner is a third party challenging the issuance of a permit.  Thus, a third-party petitioner must show that the permit, as issued, would violate the Act or the Board's regulations.  See 
Damron v. Illinois Environmental Protection Agency
, Illinois Pollution Control Bd. Op. 93-215 (April 21, 1994) (construing Board regulations and holding that when a third party challenges the issuance of a permit, it must show that the permit, as issued, would violate the Act or applicable regulations).  

Prairie Rivers acknowledges that in connection with its procedural objections to the NPDES permit, the Board had to determine whether the IEPA complied with applicable procedural statutes and regulations in issuing the permit.  However, Prairie Rivers then suggests that the Board's determination that "Prairie Rivers [had] the burden of proving that the permit, as issued, 
would
 violate the Act or Board regulations" (emphasis in original) raises a question as to whether the Board analyzed its procedural objections on some basis other than whether the record "show[ed] that the proper procedures were used in issuing the permit."  We are not persuaded. 

We agree with Black Beauty that in the context of a procedural challenge to the IEPA's issuance of a permit, Prairie Rivers has offered no plausible interpretation of the phrase "that the permit, as issued, would violate the Act or Board regulations" other than "was issued in violation of the applicable procedural statutory and regulatory provisions."  In addition, the record belies Prairie Rivers' suggestion that the Board analyzed its procedural objections on some basis other than whether the IEPA issued the permit in violation of applicable procedural statutory and regulatory provisions.  In rejecting Prairie Rivers' procedural challenge, the Board stated, in pertinent part, as follows:

"Illinois has specific regulations setting forth the procedures [the IEPA] must follow in issuing an NPDES permit.  See 35 Ill. Adm. Code [§§]309.108, 309.109, 309.115, and 309.119.  [The IEPA] complied with these procedures.  Prairie Rivers' arguments that [the IEPA] should have provided additional opportunities pursuant to [US EPA] guidelines and the [Clean Water Act] are not persuasive, because these federal procedures are inapplicable here." 

D. Prairie Rivers' Claim That It Was Denied 

a Meaningful Opportunity To Participate 

in the Final Permit-Writing Process

Prairie Rivers next argues that the Board erred by denying Prairie Rivers' petition because the IEPA failed to provide it with a meaningful opportunity to participate in the final permit-writing process.  Specifically, Prairie Rivers contends that, instead of issuing a final NPDES permit in response to comments the IEPA received on the original draft permit, the IEPA should have issued a second draft permit and provided Prairie Rivers and interested citizens an opportunity to comment upon the changes that had been made to the original draft permit.  Prairie Rivers claims that the IEPA's failure to submit the "drastically revised permit" to a another round of public comment contravened (1) the public participation requirement of the Clean Water Act (33 U.S.C. §1251 
et
 
seq
. (2000)); (2) Illinois case law; and (3) article XI of the Illinois Constitution (Ill. Const. 1970, art. XI).  Prairie Rivers also claims that because the "Board permitting rules of part 309 [of Title 35 of the Code] do not attempt to delineate every possible scenario," the IEPA should be required to hold a second round of public comment when the final permit "substantially deviates" from the draft permit.  We disagree.

1. 
The
 
Clean
 
Water
 
Act

Prairie Rivers first contends that the IEPA's failure to submit the "drastically revised" final permit to a another round of public comment contravened the public participation requirement of the Clean Water Act (33 U.S.C. §1251 
et
 
seq
. (2000)).  We disagree.   

Illinois administers the federal NPDES permit program in this state, pursuant to section 1342(b) of the Clean Water Act (33 U.S.C. §1342(b) (2000)), and, as earlier noted, it has done so since the US EPA first approved the Illinois NPDES program in October 1977.  However, that does not mean that either the IEPA or the Board 
directly
 administers the Clean Water Act in Illinois.  Instead, it means only that Illinois has demonstrated to the US EPA's satisfaction that the Illinois NPDES program satisfies the statutory requirements of the Clean Water Act (see 33 U.S.C. §1342(b) (2000)) and the guidelines issued thereunder (see 33 U.S.C. §1314(i) (2000)).  See 
Citizens for a Better Environment
, 596 F.2d at 722 (after the US EPA approves a state's NPDES permit program, the state then assumes "primary responsibility for the issuance of permits and for the administration and enforcement of the NPDES program within its jurisdiction"). 

Pursuant to section 1342(b)(3) of the Clean Water Act, any state desiring to administer its own NPDES permit program must demonstrate that it has adequate authority "[t]o insure that the public *** receive[s] notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application."  33 U.S.C. §1342(b)(3) (2000).  This public participation requirement for draft permits is specifically set forth in sections 124.6 and 124.10 through 124.12 of the federal regulations.  40 C.F.R. §§124.6, 124.10, 124.11, 124.12 (2000).  Notably absent from the Clean Water Act's requirements for state NPDES programs is any requirement that such programs include provisions for the reopening of the public comment period or the preparation of a new draft permit based on information submitted during the initial comment period.  While section 124.14(b) of the Code of Federal Regulations authorizes a US EPA regional administrator to provide additional public participation under certain circumstances in connection with federal NPDES permit application processing (40 C.F.R. §124.14(b) (2000)), state NPDES programs do not have to be administered in accordance with that section (see 40 C.F.R. §123.25 (2000)).  The federal mandate for public participation in the application process, in turn, is incorporated into the Illinois NPDES program in sections 309.109, 309.113, 309.115, 309.116, and 309.117 of Title 35 of the Code (35 Ill. Adm. Code §§309.109, 309.113, 309.115, 309.116, 309.117 (Conway Greene CD-ROM June 2002)).      

Because the US EPA has approved the Illinois NPDES permit program as complying with the Clean Water Act, Prairie Rivers' challenges to the IEPA's issuance of the NPDES permit to Black Beauty must be evaluated solely on the basis of applicable provisions of the Act and state regulations.  To the extent that Prairie Rivers believes that the Illinois NPDES permit program does not conform to the applicable provisions of the Clean Water Act, Prairie Rivers may challenge the US EPA's approval of Illinois's program.  See, 
e.g.
, 
Hall v. United States Environmental Protection Agency
, 273 F.3d 1146 (2001) (in which an individual challenged the US EPA's approval of a revision to a county's air quality plan); 
Citizens for a Better Environment
, 596 F.2d at 722 (in which a public interest group challenged the US EPA's approval of the Illinois NPDES program).         

2. 
Illinois
 
Case
 
Law

Prairie Rivers next contends that the Fifth District Appellate Court's decision in 
Village of Sauget v. Pollution Control Board
, 207 Ill. App. 3d 974, 566 N.E.2d 724 (1990), "requires that the permit be remanded to the [a]gency."  Specifically, Prairie Rivers relies on 
Sauget
 to support its contention that the IEPA should have submitted the "drastically revised permit" to another round of public comment.  We disagree.

In 
Sauget
, the Village of Sauget (Sauget) applied for an NPDES permit for one of its wastewater treatment facilities (AB facility).  In response to the application, the IEPA prepared a draft permit covering the AB facility and another facility, the P/C plant.  The US EPA then informed the IEPA that the US EPA wished to comment on the draft permit.  The US EPA later untimely commented on the draft permit in three letters to the IEPA, but did not provide those letters to Sauget.  In addition, the IEPA did not provide Sauget the US EPA's final letter until about one month after the IEPA had received it.  Less than two weeks later, the IEPA issued two final permits to Sauget, one for each facility.  
Sauget
, 207 Ill. App. 3d at 976, 566 N.E.2d at 726.

Sauget and Monsanto Company (Monsanto), whose plant was a major industrial facility served by the AB facility, appealed the terms of both final permits to the Board.  The Board determined that the P/C permit was void, and with regard to the AB facility permit, "struck some of the contested conditions, affirmed others, and ordered the remainder to be modified."  
Sauget
, 207 Ill. App. 3d at 977, 566 N.E.2d at 726.  Sauget and Monsanto then appealed the Board's ruling to the Fifth District Appellate Court.  
Sauget
, 207 Ill. App. 3d at 976-77, 566 N.E.2d at 726.

On appeal, the Fifth District concluded that the US EPA's comments were untimely and the US EPA improperly failed to provide its comments on the draft permit to the applicant, Sauget, in violation of section 309.109(b) of Title 35 of the Code (35 Ill. Adm. Code §309.109(b) (Conway Greene CD-ROM June 2002)), stating as follows:

"Section 309.109(b) of [Title 35 of] the [Code] states that comments submitted on tentative determinations shall be submitted to the IEPA and to the applicant.  [Citation.]  The [US] EPA has never submitted its comments to Sauget.  Appellees do not contest Sauget's statement that Sauget first received a copy of the [US] EPA's final comment letter of February 14, 1986, on March 10, 1986, when the IEPA provided Sauget with a copy.  ***  Monsanto claims that the late notice of the [US] EPA's comments effectively denied anyone an opportunity to respond to the additional permit conditions, particularly when the final NPDES permit, including the [US] EPA's additional conditions, was issued March 21, 1986, only 11 days after Sauget received a copy of the [US] EPA's final comment letter.

***

Had the [US] EPA timely submitted its comments on the draft permit, and provided the appellants with notice of the same, a prepermit issuance hearing could have been requested.  [Citations.]  We recognize that a hearing pursuant to these regulations is discretionary with the IEPA, yet under the circumstances appellants were denied the opportunity to request that the IEPA exert such discretion. ***

More significant with regard to the issue at bar are the requirements of section 309.108.  [Citation.]  That section provides in part that if the IEPA's tentative determination is to issue the NPDES permit, that determination should at least include:

* * *

(3) 
A
 
brief
 
description
 
of
 
any
 
other
 
proposed
 
special
 
conditions
 which will have a significant impact upon the discharge.

(c) 
A
 
statement
 
of
 
the
 
basis
 
for
 
each
 of the permit conditions listed in [s]ection 308.108(b)." 

(Emphases in original.)  
Sauget
, 207 Ill. App. 3d at 980-81, 566 N.E.2d at 728-29. 

Contrary to Prairie Rivers' contention, 
Sauget
 is inapposite.  That case considered (1) the failure of an entity that submitted comments regarding a draft permit and the IEPA to provide those comments to a permit applicant, as required by section 309.109(b) of Title 35 of the Code (35 Ill. Adm. Code §309.109(b) (Conway Greene CD-ROM June 2002)); and (2) the IEPA's resulting failure to include in the public notice of its tentative determination certain proposed conditions.  The 
Sauget
 court did not address whether the IEPA must reopen the public comment period whenever it makes significant changes to a draft permit.  Accordingly, the Fifth District's decision in 
Sauget
 does not, as Prairie Rivers claims, "require[] that the permit" issued to Black Beauty "be remanded to the [a]gency."     

3. 
Article
 
XI
 
of
 
the
 
Illinois
 
Constitution
 

Although not set forth in a separate argument section, Prairie Rivers contends, in conclusory fashion, that (1) its right to meaningfully participate in the NPDES permit process is "also supported by [a]rticle XI of the Illinois Constitution"; and (2) article XI "give[s] persons seeking clean water at least as much right to participate as those seeking permits to pollute" (see Ill. Const. 1970, art. XI).  We disagree.

In 
Landfill, Inc. v. Pollution Control Board
, 74 Ill. 2d 541, 559, 387 N.E.2d 258, 265 (1978), our supreme court rejected a party's argument that the IEPA's issuance of a landfill permit impinged on the third-party intervenors' constitutional right to a healthful environment under article XI of the Illinois Constitution (Ill. Const. 1970, art. XI).  In so concluding, the court reasoned that the "constitutional argument [was] without merit in light of the statutorily established mechanism for persons not directly involved in the permit-application process to protect their interests."  
Landfill, Inc.
, 74 Ill. 2d at 559, 387 N.E.2d at 265.  Similarly, in this case, Prairie Rivers' constitutional argument lacks merit in light of part 309 of Title 35 of the Code, which establishes a procedure for the public to participate in the issuance of NPDES permits.

4. 
Regulations
 
Under
 
Section
 
309
, 
Title
 
35
, 
of
 
the
 
Code

Last, Prairie Rivers does not dispute that the IEPA complied with the applicable state regulations in issuing the NPDES permit to Black Beauty.  As we earlier discussed, section 309 of Title 35 of the Code authorizes the IEPA to make "significant changes" in a draft permit after public comment.  See 35 Ill. Adm. Code §309.119 (Conway Greene CD-ROM June 2002) ("[f]ollowing the public hearing, the [a]gency may make such modifications in the terms and conditions of proposed permits as may be appropriate," and when the IEPA transmits a final permit to the US EPA for review, the agency must notify the applicant and other interested parties of  "any significant changes which were made from terms and conditions set forth in the draft permit").  Nonetheless, Prairie Rivers contends that because the "Board permitting rules of part 309 [of Title 35 of the Code] do not attempt to delineate every possible scenario," the IEPA should be required to hold a second round of public comment when the final permit "substantially deviates" from the draft permit.  We disagree.

In general, "[a]dministrative agencies are required to apply their rules as written, without making 
ad
 
hoc
 exceptions in adjudications of particular cases."  
Panhandle Eastern Pipe Line Co. v. Environmental Protection Agency
, 314 Ill. App. 3d 296, 303, 734 N.E.2d 18, 23-24 (2000).  Prairie Rivers cites no authority for its claims that (1) the applicable regulations merely establish a floor for NPDES permitting procedures; and (2) the IEPA has inherent authority to afford the public whatever additional opportunities for participation the agency may see fit.  Instead, as the Board and the IEPA point out, agencies only have the power given to them through enabling legislation (
Granite City Division of National Steel Co. v. Illinois Pollution Control Board
, 155 Ill. 2d 149, 171, 613 N.E.2d 719, 729 (1993)), and section 39 of the Act explicitly provides that in granting permits, the IEPA "may impose such conditions as may be necessary to accomplish the purposes of this Act, and as are not inconsistent with the regulations promulgated by the Board hereunder" (415 ILCS 5/39(a) (West 2000)).  See also 415 ILCS 5/39(b) (West 1998) (the IEPA may adopt "filing requirements and procedures" for NPDES permit applications, which must be "consistent with the Act or regulations adopted by the Board"); 
Peabody Coal Co. v. Pollution Control Board
, 36 Ill. App. 3d 5, 20, 344 N.E.2d 279, 290 (1976) (holding that the Board does not have authority to delegate its NPDES rule-making responsibility to the IEPA).  Accordingly, we conclude that the IEPA was not required to issue a second draft permit and reopen the public comment period in direct contravention of applicable regulations. 

In so concluding, we note that Prairie Rivers makes several policy-related arguments in support of its contention that when the final permit is a "drastically revised" version of the draft permit, the IEPA should issue a second draft permit and provide the public an opportunity to comment on the revised permit.  In particular, Prairie Rivers asserts the following:  (1) if the public is never allowed a second round of public comment, it "would eviscerate the public's right to participate in the NPDES permitting procedure so severely that Illinois could not maintain its NPDES program"; (2) when "additional comments should be allowed is a matter of judgment that requires gauging whether the revisions raise issues or questions that were not sufficiently aired in the comments on the initial draft permit"; (3) even after a permit is revised to benefit certain parties, "serious questions may remain regarding the permit and the sufficiency or efficacy of the revisions"; and (4) the ability of a third party to appeal the issuance of a permit "does not replace the important benefits that can be gained from additional comments."  Whatever merit these assertions may possess, the appellate court is not the forum to which they should be addressed.  Instead, Prairie Rivers should address its proposed change in the regulations to the Board.  See 415 ILCS 5/27 (West 2000); 35 Ill. Adm. Code §102.200 (Conway Greene CD-ROM June 2002) ("[a]ny person may submit a regulatory proposal for the adoption, amendment, or repeal of a regulation").

E. Prairie Rivers' Claim That the Final Permit 

Did Not Include Certain Required Conditions

Prairie Rivers next argues that the IEPA failed to include in the final NPDES permit certain monitoring conditions required by the Clean Water Act and state regulations.  Specifically, Prairie Rivers contends that the final permit improperly allowed Black Beauty to develop and submit the following items after the final permit was issued:  (1) a biological inventory of the Little Vermilion River around the mine site; and (2) an operational plan to assure compliance with the condition set forth in the final permit that Black Beauty may discharge storm and groundwater only when there is a three-to-one ratio between the unnamed tributary flow and the discharge flow.  

We conclude that this issue is moot.  At the time of the May 2001 hearing, Black Beauty had (1) submitted to the IEPA a biological inventory, and (2) installed a staff gauge in the tributary to determine whether the three-to-one dilution ratio exists.  See 
In re Adoption of Walgreen
, 186 Ill. 2d 362, 365, 710 N.E.2d 1226, 1227 (1999) ("when an opinion on a question of law cannot affect the result as to the parties or controversy in the case before it, a court should not resolve the question merely for the sake of setting a precedent to govern potential future cases"); see also 
First National Bank of Waukegan v. Kusper
, 98 Ill. 2d 226, 235, 456 N.E.2d 7, 10 (1983) (a court will not review cases merely to establish a precedent or guide future litigation).

However, in "certain, rare cases," a moot issue may be considered where "'the magnitude or immediacy of the interests involved warrant[s] action by the court' or where the issue is '"likely to recur but unlikely to last long enough to allow appellate review to take place because of the intrinsically short-lived nature of the controversies."'"  
Dixon v. Chicago & North Western Transportation Co.
, 151 Ill. 2d 108, 117-18, 601 N.E.2d 704, 708 (1992), quoting 
Kusper
, 98 Ill. 2d at 235, 456 N.E.2d at 10-11, quoting 
People ex rel. Black v. Dukes
, 96 Ill. 2d 273, 277-78, 449 N.E.2d 856, 858 (1983).  The present issue does not fall within either exception to the mootness doctrine.  Indeed, Prairie Rivers does not contend that an exception to the mootness doctrine applies.  

F. The IEPA's Alleged Reliance on 

Documents Produced by Black Beauty 

Following the Public Comment Period

Last, Prairie Rivers argues that the Board erred by denying Prairie Rivers' petition because the IEPA improperly relied on "key documents" produced by Black Beauty after the close of the public comment period.  

Initially, we note that Prairie Rivers has failed to cite any authority in support of its position.  
In addition, although Prairie Rivers claims that the IEPA relied on a "portion" of the alleged "key documents" "to justify issuance of the permit," it fails to support its assertion with logical and rea­soned argu­ment or cita­tion to rele­vant pag­es of the record
.  
Prairie Rivers cites the page of the record where one of the alleged key documents can be found; however, it has failed to direct our attention to the other alleged key document or documents.  Neither does it cite any page of the record indicating that the IEPA actually relied on the documents.
  It is a rudi­mentary rule of appel­late practice that an appellant may not make a point merely by stating it without presenting any argument in support.  
See 
Rivera v. Arana
, 322 Ill. App. 3d 641, 648, 749 N.E.2d 434, 440 (2001) (failure to cite to relevant authority forfeits an issue on appeal)
. 

Strict adherence to the require­ment of citing rele­vant pages of the record is neces­sary to expe­dite and facili­tate the adminis­tration of justice.  
Maun v. Department of Professional Regulation
, 299 Ill. App. 3d 388, 399, 701 N.E.2d 791, 799 (1998); 
Sohaey v. Van Cura
, 240 Ill. App. 3d 266, 273, 607 N.E.2d 253, 260 (1992).  
With regard to this contention, defendant's brief fails to comply with the requirements set forth in Supreme Court Rule 341(e)(7) 
(188 Ill. 2d R. 341(e)(7))
, which provides that the argument section of an appellant's brief "shall contain the contentions of the appellant and the 
reasons there­for, with citation of the authorities and the pages of the record relied on.  Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal *** where evidence may be found."  Arguments that do not satisfy Rule 341(e)(7) do not merit consideration on appeal (
Maun
, 299 Ill. App. 3d at 399, 701 N.E.2d at 799)
 and may be reject­ed for that reason alone (
Calomino v. Board of Fire & Police Commis­sioners
, 273 Ill. App. 3d 494, 501, 652 N.E.2d 1126, 1132 (1995)).  In light of Prairie Rivers' failure to comply with Rule 341(e)(7), we conclude that it has forfeited this issue on appeal.
 

Moreover, even assuming that the IEPA relied on documents submitted by Black Beauty after the public comment  period, our research has not revealed any applicable state law or regulation that prohibits the IEPA from seeking information from an NPDES permit applicant after the public comment period or considering such information in issuing a final permit. 

III. CONCLUSION 

For the reasons stated, we affirm the Board’s decision.

Affirmed.

McCULLOUGH, P.J., and TURNER, J., concur.