A03A2340. GWINNETT COUNTY v. LAKE LANIER
ASSOCIATION et al.
A03A2341. REHEIS v. HUGHEY et al.
A03A2342. HUGHEY v. ENVIRONMENTAL PROTECTION
DIVISION, DEPARTMENT OF NATURAL RESOURCES.
(593 SE2d 678)

ELDRIDGE, Judge.

Lake Lanier Association, Terence D. Hughey, Upper Chattahoochee Riverkeeper Fund, Inc., and the Sierra Club petitioned for judicial review to the Superior Court of Hall County from the administrative law judge's ("ALJ") affirmance of the grant by the Georgia Environmental Protection Division ("EPD") of wastewater discharge National Pollutant Discharge Elimination System ("NPDES") Permit No. GA0038130 to Gwinnett County, allowing it to discharge into Lake Lanier highly treated wastewater. The trial court affirmed in part and reversed in part the ALJ's Final Decision. The reversal involved two issues: public notice and antidegradation; with regard thereto, the trial court misinterpreted state antidegradation regulations and applicable law, as well as the public notice and comment regulations, which we reverse as legal error. As to the trial court's affirmance of the ALJ, we find no error and affirm.

*Factual Basis: Case Nos. A03A2340 and A03A2341*

The Georgia Water Quality Control Act, OCGA § 12-5-20, authorizes the EPD to implement, administer, and enforce the Act and rules promulgated under the Act regarding water quality standards and issuing permits. The Georgia Board of Natural Resources ("Board") is conferred with the authority to promulgate rules and regulations governing water quality standards and the NPDES, which EPD implements. OCGA §§ 12-5-23 (b) (3), (c) (15); 12-5-30; 33 USC §§ 1311 (a); 1342. The Board adopted water quality standards and the federal Environmental Protection Agency ("EPA") approved them for designated uses, which specifically included water quality standards for Lake Lanier. Ga. Comp. R. & Regs. r. 391-3-6-.03 (5), (17) (e). The Director of EPD has the responsibility for issuing NPDES permits. OCGA §§ 12-5-23 (b) (3), (c) (15); 12-5-30. Because the EPA has approved Georgia's NPDES program as complying with the federal Clean Water Act, any challenges to such issued permits are evaluated against the requirements of Georgia law and regulations and those federal regulations incorporated by reference. See *Prairie Rivers Network v. Illinois Pollution Control Bd.*, 335 Ill. App.3d 391, 403 (781 NE2d 372) (2002) (challenge to Illinois-issued NPDES permit).

Any discharge or proposed discharge of any pollutant into Geor-

gia waters from a point source must obtain a NPDES permit from EPD. OCGA § 12-5-30; Ga. Comp. R. & Regs. r. 391-3-6-.06 (3) (a). Such permit is issued for no more than five years. Ga. Comp. R. & Regs. r. 391-3-6-.06 (15) (a). The NPDES permit for a new point source discharge must contain limitations necessary to meet water quality standards which were established to protect the receiving water's designated uses. Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (c) (3). In determining what effluent limitations to establish in the NPDES permit, an evaluation of the proposed discharge is required by the regulations. Ga. Comp. R. & Regs. r. 391-3-6-.06 (4) (b) (incorporated by reference 40 CFR § 122.44 (d) (i)). Only those pollutants which are known or expected to be present in the discharge must be limited in the permit. Proposed NPDES permits must be submitted by EPD to the EPA for review and approval. 33 USC § 1342 (d) (1); 40 CFR § 123.43 (a) (1). Thus, EPD is prohibited from issuing a permit if EPA objects within 90 days. 33 USC § 1342 (d) (2). The NPDES permit in this case was submitted by EPD to EPA for review; and both EPD and EPA gave the permit application a higher level of scrutiny than usual without either finding any objectionable issues.

> Although the administration and enforcement of the permit program initially [were] vested entirely in the EPA, Congress intended that much of this authority would devolve to the states. See § 101 (b), 33 USC § 1251 (b). The Clean Water Act stipulates that any time after the promulgation of EPA guidelines establishing the minimum elements of state permit programs, a state may submit a description of a proposed program, along with a statement from the state attorney general that state law provides adequate authority to carry out the program, for evaluation by the Administrator of the EPA. If the state program satisfies the statutory requirements of section 402 (b) [of the Clean Water Act], 33 USC § 1342 (b), and the guidelines issued under section 304 (i), 33 USC § 1314 (i), the Administrator must approve the program. The state would then assume primary responsibility for the issuance of permits and for the administration and enforcement of the NPDES program within its jurisdiction.

*Citizens for a Better Environment v. Environmental Protection Agency*, 596 F2d 720, 721-722 (7th Cir. 1979); accord *Prairie Rivers Network v. Illinois Pollution Control Bd.*, supra at 398.

On August 4, 1999, Gwinnett submitted a NPDES permit application to EPD to discharge highly treated wastewater into Lake Lanier. On August 8, 2000, EPD provided a draft permit ("Permit")

for public comment, providing a fact sheet for Lake Lanier as the discharge site and giving a general geographic description of the discharge point as near Buford Dam in Lake Lanier. During the public comment period, EPD received over 200 comment letters from the public both for and against the Permit. The Association submitted comments during the public comment period. On November 9, 2000, after the public comment period had closed, EPD issued the Permit to Gwinnett County to discharge highly treated wastewater from the North Advanced Water Reclamation Facility ("North Plant") to the Buford Dam embayment of Lake Lanier. Also, the EPD issued its response to the public comments. After making revisions to the draft permit versions based on the public comments, the EPD did not put the Permit out for another public notice and comment period prior to issuing the final Permit. The final Permit included a revised discharge point in Lake Lanier near Buford Dam, which was determined after the close of the public comment period.

On December 8, 2000, Hughey, the Association, the Riverkeepers, and Sierra Club (hereinafter referred to collectively as the "Association") administratively appealed EPD's permit issuance. On March 16, 2001, Gwinnett was permitted to intervene in the appeal. On March 23, 2001, the Association filed a motion for summary determination, contending that in issuing the Permit EPD violated the applicable public notice and comment requirements. On April 20, 2001, the ALJ denied the motion, finding that EPD had complied with applicable public notice and comment requirements.

Over 17 days, the ALJ took testimony, held an evidentiary hearing involving 24 witnesses, and made findings of fact and conclusions of law based upon such evidence. On October 16, 2002, the ALJ issued a Final Decision affirming the EPD's permit issuance and finding in favor of EPD and Gwinnett on all issues. In determining whether the Permit complied with antidegradation requirements, the ALJ found: that the discharge was necessary for social and economic development; that Gwinnett had demonstrated the need for additional wastewater capacity; that there were no alternatives available to Gwinnett; that returning treated water to Lake Lanier provided such necessary social and economic development; that Gwinnett had affirmatively demonstrated to EPD compliance with antidegradation requirements; and that EPD approved Gwinnett's demonstration.

*Factual Basis: Case No. A03A2342*

Gwinnett's permit application indicated that the discharge was not expected to contain any detectable levels of mercury. Samples taken at the North Plant facility did not indicate the presence of mer-

cury coming into the plant. The data reviewed by an expert witness showed that there would be no mercury coming into the plant. Further, the expert testified that even if mercury were present in the influent, the processes utilized by the North Plant would remove the metal to nondetectable levels in the effluent. The North Plant is patterned after the most advanced treatment facilities in the country. Testing at such other facilities has shown no evidence of mercury or other materials at levels that produce acute or chronic toxicity in the effluent. The Permit contained the requirements that Gwinnett perform quarterly Priority Pollution and Whole Effluent Toxicity testing and monitoring for the discharge for mercury.

At the hearing, Roosevelt Childress, the Chief of the U. S. EPA's Region 4 NPDES and Biosolids Permit Section, testified. For the last thirty years of the existence of the NPDES program, he has reviewed and supervised NPDES permits for eight states including Region 4. Childress gave his expert testimony that the Permit posed no environmental or health risks. He further testified that the Permit did not authorize the unlimited discharge of mercury as contended by the Association. If the required monitoring under the Permit were to indicate the presence of mercury in the discharge, the State could reopen the Permit and include in it an effluent limit for mercury to protect the water quality standards. Condition I.B.1 of the Permit required Priority Pollutant testing, which included testing for mercury. Such testing is used in conjunction with "whole effluent toxicity" ("WET") testing, which the Permit requires quarterly. Thus, if the effluent passes the WET testing, then it is considered to have no long-term adverse effect. The organisms used in the WET test are those types of organisms found in Lake Lanier and are more sensitive to the effects of toxicity than are people sensitive to such toxicity. The Permit specifically requires the monitoring for mercury. EPA requested the addition of such condition, because when the EPA reviewed the draft Permit, Lake Lanier had been on the State's list of impaired waters, based on mercury levels in some species and fish tissue sizes. Since such review, Lake Lanier has been removed from the list of impaired waters with EPA's concurrence. Childress testified further that this Permit received greater EPA scrutiny than usual; that EPA concluded that the Permit was protective of water quality standards, including those for Lake Lanier and Georgia water quality standards for designated uses; and that the EPA found the Permit to be satisfactory.

The Permit sets a fecal coliform limit of 23 colonies/100 ml, which is a very high removal level for pathogens and fecal coliform. Expert testimony described North Plant as having a number of pathogen barriers that kill or inactivate pathogens, consisting of bacteria, viruses, and protozoa. The Permit limit for North Plant requires

removal efficiency of 99.99 percent to 99.999 percent for fecal coliform. Thus, for purpose of drinking water or swimming in the vicinity of the discharge point, there is no danger because of the high quality of the effluent.

The numerical discharge limit for phosphorus under the Permit is 0.13 milligrams per liter (parts per million). Condition I.C.10 of the Permit requires that Gwinnett not commence any phase of the permitted discharges until the combined permitted annual point source phosphorus loads being discharged into Lake Lanier from other permitees are reduced by equal or greater amounts specified in that condition.

### Case Nos. A03A2340 and A03A2341

1. The trial court erroneously reversed the Final Decision of the ALJ by interpreting the regulations requiring EPD to provide public notice of and opportunity for public comment on a draft NPDES permit and to respond to public comments on the draft permit and ignored the ALJ's findings concerning the notice and permitted discharge points; therefore, the trial court's order is reversed and the ALJ's decision is affirmed.

The trial court erred in reversing the Final Decision of the ALJ relating to public notice by reversing on an issue that had not been presented before the ALJ and by making factual findings that conflicted with the specific findings and conclusions made by the ALJ in support of the Final Decision.

Under the superior court's appellate standard of review of an administrative decision on a judicial petition, the "any evidence" standard applies. Under the Administrative Procedure Act ("APA"), the superior court "must accept the factual findings of the [ALJ] if there is any evidence to support them" and must construe the evidence in favor of the decision rendered. *Ga. Power Co. v. Ga. Public Svc. Comm.*, 196 Ga. App. 572, 580-581 (5) (396 SE2d 562) (1990). In reviewing the decision of the superior court under the Appellate Practice Act, the appellate courts do "[not] review whether the record supports the superior court's decision but [rather] whether the record supports the initial decision of the . . . administrative agency." (Citations omitted.) *Emory Univ. v. Levitas*, 260 Ga. 894, 898 (1) (401 SE2d 691) (1991); *Sawyer v. Reheis*, 213 Ga. App. 727, 729 (1) (445 SE2d 837) (1994). In this case, the record supported the ALJ's findings of fact and conclusions of law regarding notice and public comment.

The Georgia Department of Natural Resources incorporated by reference 40 CFR § 124.10 (d) (vii) into Ga. Comp. R. & Regs. r. 391-3-6-.06 (7) (b) (1) (v), regarding notice and comment requirements. The

EPD, in compliance with the applicable statute and regulations, gave the required public notice and an opportunity to comment on the draft version of the NPDES permit in this case. OCGA § 12-5-30 (a); Ga. Comp. R. & Regs. r. 391-3-6-.06 (7). The regulation requires that: "[a]ll public notices issued under this part shall contain the following . . . information: . . . (vii) For NPDES permits only (including those for 'sludge-only facilities'), a general description of the location of each existing or proposed discharge point and the name of the receiving water." 40 CFR § 124.10 (d) (vii).

All interested members of the public, including the Association, made written comment during the comment period after adequate notice. Before the ALJ, the Association took the same position that it took before the superior court and takes before this court that after the end of the comment period any changes in the Permit by the EPA required a new notice and comment period prior to issuing a final permit. The ALJ heard and rejected this argument, because there is no basis, in either state or federal law or regulations, for such renotice and recomment period after the initial period. See OCGA § 12-5-30 (a); Ga. Comp. R. & Regs. r. 391-3-6-.06 (7) (40 CFR § 124.17 (a) (1)); *Adams v. U. S. Environmental Protection Agency*, 38 F3d 43, 51 (1st Cir. 1994). See also *Prairie Rivers Network v. Illinois Pollution Control Bd.*, supra at 396-397 (where this argument was rejected under similar circumstances).

The ALJ found as undisputed fact that:

> The Draft Permit provided that the treated wastewater would be discharged to Lake Lanier via an underground pipeline to a location in the lake near the main river channel where Gwinnett, Forsyth, and Hall county lines meet. The discharge would be at a depth of 145 feet below the normal pool elevation of the lake.

The ALJ further found as undisputed fact that the EPD's changes relating to discharge location and depth which resulted in a different discharge point from those set forth in the notice were made after the close of the public comment period:

> EPD then modified the Draft Permit in the following manner: the discharge would be into Lake Lanier but [would be] at a location . . . 1.2 miles upstream from Buford Dam, near the mouth of Shoal Creek, via a different underground pipeline and discharged at a depth of 32 feet below the normal elevation of the lake.

Such "general description" of the proposed discharge point and receiving waters sufficiently satisfied the regulations for purposes of

public notice, review, and comment. After the public notice and receipt of comments on the draft permit had closed, the EPD was empowered by the regulations to revise, alter, or change the discharge point as it deemed appropriate in its administrative discretion, which was expressed in the regulations, without further notice or public comment.

> States are only required to issue a response to comments when a final permit is issued. This response shall: (1) Specify which provisions, if any, of the draft permit have been changed in the final permit decision.

40 CFR § 124.17 (a); Ga. Comp. R. & Regs. r. 391-3-6-.06 (7) (b) (1) (iv).

The ALJ found as a matter of law that "at the very core of this requirement for public notice and comment will be based upon public concern. *Adams v. U. S. Environmental Protection Agency*, [supra]." "When the EPA promulgated its procedural regulations governing the public comment period, the Agency anticipated that most policy and technical issues would be decided as part of the public comment period, . . . which comes at a stage where the Agency has the greatest ability to modify a draft permit." (Citation omitted.) *Adams v. U. S. Environmental Protection Agency*, supra at 51.

The trial court erred as a matter of law in reversing the ALJ when it found that:

> the ALJ failed to address the question whether the changes that were made relating to discharge location and depth resulted in a different "discharge point." . . . The discharge point, in addition to the name of the receiving water, must be identified so that public notice and comment [are] meaningful. Requiring only the body of water to be identified would frustrate this process, particularly concerning a body the size of Lake Lanier.

The trial court confused the notice and comment requirements for a draft permit with the post-comment period power of the EPA to revise, alter, amend, or change the discharge point. The EPA is not required to give a new notice and comment period following any change made subsequent to the expiration of the public comment period.

Further, modification of existing permit rules does not apply to draft permits that are changed, altered, revised, or amended by the EPA after the close of the public comment period and prior to the issuance of a final permit. See Ga. Comp. R. & Regs. r. 391-3-6-.06 (7); cf. Ga. Comp. R. & Regs. r. 391-3-6-.06 (12).

"Although we have determined that the superior court erred in its standard of review, we need not remand the case to the trial court for it to apply the any-evidence standard," because both this court and the trial court are bound by the factual findings of the ALJ. *Emory Univ. v. Levitas*, supra at 898.

2. The trial court erred in reversing the ALJ's antidegradation conclusion by improperly allocating the burden of proof to the EPA and Gwinnett as to whether the Permit's issuance complied with state and federal antidegradation requirements, by interpreting the antidegradation requirements upon grounds not at issue in the administrative hearing, and by substituting its judgment for the ALJ's.

On this administrative appeal, the ALJ had to determine whether the Association, in this case, had affirmatively proved non-compliance by the EPD with the antidegradation requirements; instead, on the petition for judicial review, the trial court erroneously determined that the ALJ had to affirmatively find that the EPD had complied with the applicable regulations. See Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b). The Association was not the recipient or holder of the Permit involved in the administrative appeal; therefore, it bore the burden of proof as to all issues in the administrative appeal. Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b). In the trial court's order, it erroneously ruled that the ALJ erred by:

> improperly shifting the burden to the [Association] to establish the "discharge [authorized by the Permit] is unnecessary for social and economic development" in Gwinnett County. In so doing, the ALJ failed to find that Gwinnett had met the requirements of this portion of the antidegradation regulation and that EPD properly concluded that it had.

This trial court ruling shifted the burden of proof to EPD to demonstrate compliance with one element of Georgia's antidegradation requirement from the Association, who had the burden to demonstrate noncompliance. Under OCGA § 50-13-19 (h) (5) and (6), the APA provides that:

> [t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. . . . The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: . . . (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by

abuse of discretion or clearly unwarranted exercise of discretion.

Correctly, the ALJ found there to be five elements under the antidegradation rule:

> 1) waters that exceed minimum levels must be maintained at high quality; 2) new development impacting high quality waters [may] be authorized when such change is justifiable to provide necessary social and economic development; 3) the level of treatment authorized must be the highest and best practicable under existing technology; 4) water quality necessary to protect existing uses of the water body must be maintained; and 5) the requirements of 40 CFR [§] 131.12 must be achieved before lowering of water quality is allowed.

The ALJ found that "Petitioners [(Association)] have failed to show by a preponderance of the evidence that the permit under challenge authorizes a discharge in violation of the antidegradation requirements of Rule 391-3-6-.03 (2) (a) and (b)."

The ALJ went on to find as to the first element as to antidegradation that "Lake Lanier is not higher quality now than after Gwinnett's discharge because the loading in the Lake is based on a reduction in current loading levels. . . . Gwinnett is not permitted to increase or change phosphorus loading in the Lake as set by water quality and therefore no water quality degradation will occur." Also, the ALJ found as to water quality standards other than phosphorus that "the wasteload allocation and Permit limits would not cause a violation of water quality standards."

As to the second element, the ALJ held: "Petitioners [(Association)] have failed to show by a preponderance of the evidence that this discharge is unnecessary for the social and economic development in the effected portion of the State." However, the trial court erroneously shifted the burden of proof to EPD and Gwinnett; "if the law requires that a condition exist before EPD may issue a permit, then EPD must find that the condition exists before EPD issues the permit and the ALJ must find that the condition exists in order to affirm EPD's issuance of the permit." See Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b) (places no such burden on administrative appeals on either EPD or Gwinnett). In seeking the Permit, Gwinnett had initially to affirmatively demonstrate to EPD that a change in water quality was justifiable to provide necessary social and economic development under the antidegradation rule. However, after EPD issued the final Permit, on the administrative appeal, the Association

had to prove by a preponderance of evidence that Gwinnett had failed to demonstrate to EPD in the application process that a change in water quality was justifiable. The ALJ had to find whether the Association had proved by a preponderance of the evidence that the antidegradation requirement had not been satisfied before EPD; thus, by finding that the Association had failed to carry its burden, the ALJ properly found in favor of EPD and Gwinnett on such issue. See Ga. Comp. R. & Regs. r. 391-3-6-.03 (2); r. 616-1-2-.07 (1) (b).

Further, the trial court when considering an administrative appeal on a petition for judicial review is limited to those issues raised in the administrative proceedings below preserved for judicial review and cannot consider issues raised for the first time on judicial review. See OCGA § 50-13-19 (c), (g); *Environmental Waste Reductions v. Legal Environmental Assistance Foundation*, 216 Ga. App. 699, 702 (2) (455 SE2d 393) (1995). Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b) governs the placement of the burdens of persuasion and going forward in contested cases, which in this case was on the Association.

3. The trial court erred in interpreting the antidegradation requirements to require that a change in water quality must be justifiable to provide necessary social or economic development. The ALJ made extensive findings of fact in support of the Final Decision, finding an affirmative demonstration by EPD and Gwinnett for a change in water quality in Lake Lanier provided necessary social and/or economic development. Since the record supports such findings by the ALJ, then on review they must be upheld. "The clearly erroneous standard of review to be applied by the superior court prevents a de novo determination of . . . whether the facts found by the ALJ are supported by any evidence." (Citation and punctuation omitted.) *Commr. of Ins. v. Stryker*, 218 Ga. App. 716, 717 (1) (463 SE2d 163) (1995).

(a) The trial court reversed the ALJ's Final Decision, in part, because it misunderstood that the ALJ had based the second element requirement determination of compliance solely on the benefit of returning water to the basin. The record sets forth that the ALJ made 11 specific findings of fact to conclude that the proposed discharge and its impact on the water quality of Lake Lanier were necessary for social or economic development. But the return of waters to the basin of their origin constitutes in satisfaction of the applicable antidegradation requirements can provide necessary social and economic development.

It is therefore declared to be the policy of the State of Georgia that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to

restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters.

OCGA § 12-5-21 (a). Thus, in addition to the substantial benefit of returning highly treated water to the basin of origin, the ALJ identified the projected long-range population growth in Gwinnett County and the importance of Lake Lanier to Georgia's economy and the Interstate Compact negotiations as evidence that the discharge was justified under the antidegradation requirements to meet future water needs which water supply was "essential to the health, welfare, and economic progress of the area." OCGA § 12-5-571 (a).

Therefore, the trial court erred in substituting its judgment on the facts for the ALJ's in determining whether this element of the antidegradation provision had been satisfied.

(b) The trial court also erroneously concluded that the State's antidegradation provision required the imposition of permit limitations that were more stringent than the wastewater treatment plant was capable of producing, i.e., requiring cleaner water than authorized by the Permit. The trial court's order stated that "Gwinnett's discharge can be cleaner than that authorized by the Permit, and thus the lower water quality allowed by the Permit is not justifiable to provide necessary social or economic development." Thus, the trial court found the lower water quality allowed by the Permit must be per se not justifiable. This was error as a matter of law.

(c) The trial court erred, because no party in the administrative proceedings contended that the antidegradation provisions required the imposition of effluent limits as stringent as the highest treatment level that the plant was capable of producing. Thus, such issue was never preserved for consideration on judicial review. Such conclusion of the trial court directly conflicted with expert testimony in the administrative proceedings, which was specifically referenced by the ALJ's findings of fact and conclusions of law.

The ALJ found many reasons why "[r]equiring Gwinnett County to meet discharge limits that mirror existing discharge characteristics is inappropriate." By holding to the contrary, the trial court substituted its judgment for the factfinder who heard the administrative hearing and took evidence; therefore, the trial court improperly ignored the findings of fact made by the ALJ in support of the conclusions of law.

(d) The trial court incorrectly applied the elements of the antidegradation provisions to the facts found by the ALJ, because the second element of the antidegradation provision only requires the determination that "a change [to water quality] is justifi[ed] to provide necessary social or economic development." Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b). From the evidence, the ALJ found that

such justification had been established. However, the trial court found that, for a change in water quality, such change must be "necessary" and not merely "justified." The technology evaluation relied upon by the trial court applied to the third requirement and not to the second. In the third element, it required that "the level of treatment required is the highest and best . . . under existing technology to protect existing beneficial . . . uses." Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b). Thus, the trial court mixed the requirements of the second and third elements together erroneously.

### Case No. A03A2342

Under the Georgia Water Quality Control Act, OCGA § 12-5-20 et seq., and the federal Clean Water Act, 33 USC § 1251 et seq., discharge of a pollutant from a point source into waters of Georgia is prohibited when not in compliance and accordance with a NPDES permit. OCGA § 12-5-30; 33 USC §§ 1311 (a); 1342. Judicially, Georgia has been adjudicated as meeting the requirements of the federal Clean Water Act. *Hughey v. JMS Dev. Corp.*, 78 F3d 1523, 1525 (11th Cir. 1996). Under the Clean Water Act, Georgia was mandated to adopt water quality standards for its waters, which it has done. 33 USC § 1313 (a), (b), (c) (1). The water quality standards expressed as numeric pollutant concentration levels or narrative statements represented a quality of water that supports a particular designated use. 33 USC § 1313 (c) (2) (A). The EPA reviewed and approved the submitted Georgia water quality standards, "to ensure that the underlying criteria, which are used as the basis of a particular state's water quality standard, are scientifically defensible and are protective of designated uses." *Natural Resources Defense Council v. U. S. Environmental Protection Agency*, 16 F3d 1395, 1402 (4th Cir. 1993); see also 33 USC § 1313 (c) (2) (A). "Water quality standards are a critical component of the [Clean Water Act] regulatory scheme because such standards serve as a guideline for setting applicable limitations in individual discharge permits." Id. at 1399.

4. The trial court correctly affirmed the ALJ's Final Decision that there was no requirement for a specific effluent limit on mercury to be in the Permit. The Association contends that the EPD, the EPA, the ALJ, and now the trial court erred in the finding that the NPDES permit did not need an effluent limitation on mercury. NPDES permits are only required to limit those pollutants "which the Director determines are or may be discharged at a level which will cause, have [a] reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." 40 CFR § 122.44 (d) (1) (i). In this case, the evidence showed that mercury was not expected to be in or detectable in

the effluent discharged; therefore, there could be no numeric or narrative water quality standard violation; thus, no requirement for an effluent limit. The ALJ's decision was supported by the evidence; the decision of the ALJ must be affirmed. *Ga. Power Co. v. Ga. Public Svc. Comm.*, supra at 580-581.

The Association contends that Lake Lanier fails to support its designated use for fishing and erroneously relies upon the Fish Consumption Guide, which purpose is to identify certain species of fish that should be eaten in limited amounts if consumed over an extended period of time. The evidence is that Lake Lanier is a major source of recreation, including fishing. The presence of mercury in fish tissue by virtue of bioaccumulation does not, by itself, establish a violation of water quality standards for toxic substances. The ALJ found that Lake Lanier is not an impaired water for mercury, i.e., no applicable water quality standard relating to mercury is being violated. A guideline that merely cautions regarding fish consumption is different from the prohibition of fish consumption, which indicates a violation of water quality standards.

While the affirmative defense doctrine does provide a "permit shield" as to pollutants not expressly listed in the permit after it has been issued, the permitee has no unilateral right to discharge "unlimited" quantities of a constituent not regulated in the permit where such constituent is a pollutant, because the Clean Water Act makes such discharge unlawful. 33 USC § 1311; *Piney Run Preservation Assn. v. County Commrs. of Carroll County, Maryland*, 268 F3d 255, 259, 265 (4th Cir. 2001). If a constituent is not regulated by a permit condition, the permitee has no unilateral right to discharge "unlimited" quantities of that constituent into Lake Lanier. Id. at 268-269.

5. The trial court correctly affirmed the Final Decision of the ALJ that the Permit's effluent limit for fecal coliform complied with all legal requirements.

The Association erroneously contends that the Permit must have a different effluent limitation for fecal coliform from that limit which is established by the water quality standards determined by the Board and approved by EPA for use in administering the NPDES program in Georgia. The Association argues that the effluent limitation for fecal coliform contained in the Permit fails to protect the designated use for swimming and is harmful to human health. Such claim is not supported by the evidence in the record, which shows such NPDES permit limit is nearly ten times more stringent than the promulgated water quality standard for Lake Lanier.

Under OCGA § 12-5-23.1 (b), the Georgia Water Quality Control Act, the Board shall promulgate "water quality standards for each lake which require the lake to be safe and suitable for fishing and

swimming and for use as a public water supply." Thus, the Board promulgated water quality standards applicable for Lake Lanier specifically, regarding limits for fecal coliform, pH, chlorophyll-a, total nitrogen, phosphorus, dissolved oxygen, and temperature, which were approved by the EPA. For fecal coliform for swimming use, such standard appears in Ga. Comp. R. & Regs. r. 391-3-6-.03 (6) (b) (i):

> Bacteria [for recreation waters]: Fecal coliform not to exceed the following geometric means based on at least four samples collected from a given sampling site over a 30-day period at intervals not less than 24 hours: (1) Coastal waters 100 per 100 ml[;] (2) All other recreational waters 200 per 100 ml.

The Permit limits Gwinnett to 23 colonies/100 ml, which is well within the water quality standard. The evidence showed that such level of treatment required of Gwinnett is the highest quality of any treatment plant within Georgia.

6. The trial court correctly affirmed the Final Decision of the ALJ that the Permit's effluent limit on phosphorus complied with all legal requirements.

The EPD, the EPA, the ALJ, and the trial court, all found that the effluent limitation for phosphorus in the Permit complied with the established water quality standards; however, the Association contends to the contrary without evidence in the record to support such position.

Under OCGA § 12-5-23.1 (b), the Board promulgated "water quality standards for each lake which require the lake to be safe and suitable for fishing and swimming and for use as a public water supply," and which included phosphorus standards for Lake Lanier. Under OCGA § 12-5-23.1 (c) (5), the Board was required to set a "[t]otal phosphorus loading for the lake in pounds per acre feet per year," which requires a lake-wide total loading limit average over a year. The Board determined that such standards would keep Lake Lanier safe for such uses within the water quality standards. The Board established a total lake loading water quality standard for phosphorus averaging 0.25 pounds per acre-foot per year for Lake Lanier. The Gwinnett discharge potential in the Permit authorized phosphorus discharge of 15,834 lbs/year divided by the total acre-footage of Lake Lanier at pool elevation of 2,064,600, which results in a total lake loading of the average of 0.008 pounds of phosphorus per acre-foot of Lake Lanier per year. Under the Permit, Gwinnett cannot commence its discharge of phosphorus until at least an equivalent amount of phosphorus is eliminated from the discharge of another point source discharge to Lake Lanier. Thus, before Gwinnett can

discharge phosphorus under the Permit, an equivalent amount of total phosphorus loading to Lake Lanier must be eliminated so that there will not be an addition to the total existing phosphorus loading to the lake. This does not mean as argued by the Association that the phosphorus standard applies uniformly to each specific acre-foot of the lake, because the 0.25 pounds per acre-foot per year is neither a site-specific number nor does the phosphorus loading standard fluctuate with the rise and fall of the lake. The ALJ held that neither interpretation by the Association is correct, because the impact of phosphorus in a discharge to the lake is considered in the context of the total loading to the lake, the surface area of which is set at normal pool elevation of 1,070 feet mean sea level. Ga. Comp. R. & Regs. r. 391-3-6-.03 (17) (e). Since the 0.25 pounds per acre-foot per year is the average of all loading to the lake, then some segments of the lake can have higher loading and some lower, provided that such remains within the average. The regulations state: "Phosphorous: Total lake loading shall not exceed 0.25 pounds per acre-foot of lake volume per year," which negates both any particular segment of the lake or any particular volume of water in the lake. Ga. Comp. R. & Regs. r. 391-3-6-.03 (17) (e) (iv). With the full expectation that Lake Lanier would have higher and lower levels with flood control, hydroelectric, barge, and other uses in both drought and rainy years, the Board used a standard based on the normal pool elevation for Lake Lanier at 1,070 feet mean sea level. Ga. Comp. R. & Regs. r. 391-3-6-.03 (17) (e). The Permit allows discharge levels of 0.13 mg/l using the "total lake loading" basis of the water quality standard and resulting in 0.008 pounds per acre-foot of lake volume per year, which is less than 0.25 pounds per acre-foot per year water quality standard only after an equal amount of phosphorus has been eliminated elsewhere.

Further, the trial court correctly affirmed the Final Decision of the ALJ that Lake Lanier's water quality standard for phosphorus does not fluctuate from day to day based on lake levels, because the Board specifically set the water quality standards for Lake Lanier based on an "elevation of 1070 feet mean sea level[,] corresponding to the normal pool [level]" of the lake. Ga. Comp. R. & Regs. r. 391-3-6-.03 (17) (e). Such is a yearly standard that is not effected by daily fluctuations in the lake levels, and the lake's total phosphorus loading is expressed in units of "pounds per acre feet per year." OCGA § 12-5-23.1 (c) (5).

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Mikell, J., concur.*

<span style="font-variant: small-caps">Decided January 16, 2004</span> ▮▮▮▮▮▮▮▮

*Alston & Bird, Lee A. DeHihns III, E. Peyton Nunez, Daniel N. Esrey*, for Gwinnett County.

*Smith, Gambrell & Russell, Stephen E. O'Day, Andrew M. Thompson, Justine I. Thompson*, for Lake Lanier Association and Hughey et al.

*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, John E. Hennelly, Senior Assistant Attorney General, William R. Phillips, Assistant Attorney General*, for Reheis and Environmental Protection Division.

*King & Spalding, Patricia T. Barmeyer, Lewis B. Jones, Andrew, Merritt, Reilly & Smith, Paul E. Andrew, Clyde Y. Morris, Jr., Mary M. Asbill*, amici curiae.