No. 3--07--0565
(Consolidated with No. 3–07–0819)

_____

Filed October 7, 2008
IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

_____

ILLINOIS  ENVIRONMENTAL PROTECTION ) 
AGENCY and THE VILLAGE OF NEW LENOX, ) 
                        )   On Direct Appeal from the
     Petitioners-Appellants,         )   Decision of the Illinois Pollution
                        )   Control Board
           v.                   )
                        )   No. PCB 04-88
ILLINOIS POLLUTION CONTROL BOARD, )   (Third-Party NPDES Permit
DES PLAINES RIVER WATERRSHED     )   Appeal)
ALLIANCE, PRAIRIE RIVERS NETWORK,  )
and SIERRA CLUB,              )
                        )
     Respondents-Appellees.      )

_____

     JUSTICE WRIGHT delivered the opinion of the court:

_____

     The Illinois Environmental Protection Agency (IEPA) issued a National Pollution Discharge Elimination System (NPDES) permit to the Village of New Lenox (New Lenox) to faciliate the expansion of one of New Lenox's three sewage treatment plants.  Four organizations - Des Plaines River Watershed Alliance, Livable Communities Alliance, Prairie Rivers Network, and Sierra Club (collectively Environmental Groups) - petitioned the Illinois Pollution Control Board (Board) to appeal IEPA's decision to grant the permit.  Following the hearing on the permit appeal, the Board overturned IEPA's decision to grant the permit and remanded the permit to IEPA for additional review as mandated by the Illinois Environmental Protection Act

(Act) (415 ILCS 5/1 *et seq.* (West 2002)) and the Illinois Administrative Code (Code) (35 Ill. Adm. Code §§ 101.100 *et seq.* IEPA and New Lenox (collectively appellants) filed a direct appeal to this court challenging the findings and order of the Board.

We affirm the order of the Board.

## I. BACKGROUND

The Village of New Lenox operates two publicly owned sewage treatment plants, desires to expand one existing plant that was built in 1973, and is building a third plant. The current NPDES permit for the plant scheduled for expansion allows discharge flows of effluent into Hickory Creek at an average rate of 1.54 million gallons per day (MGD) with a maximum discharge flow at 2.82 MGD. Hickory Creek ultimately joins the Des Plaines River.

In 2002, New Lenox submitted an application for a NPDES permit to expand that plant and increase the average discharge flow from the current average 1.54 MGD limit to a new average discharge rate of 2.55 MGD not to exceed a maximum discharge rate of 5.103 MGD. New Lenox had already expanded this same plant once after IEPA conducted its most recent facility-related stream survey in 1991. Therefore, IEPA required New Lenox to conduct a new analysis of the current water quality and survey of existing aquatic life currently present in Hickory Creek at the time of the permit application.

New Lenox hired Earth Tech, Inc. (Earth Tech), to conduct this survey. Earth Tech collected five water samples on August, 20, 2002, and performed a macroinvertebrate (insect) analysis. In support of its application for the NPDES permit, New Lenox submitted the Earth Tech study to IEPA along with a 2002 report from Suburban Laboratories, Inc. (Suburban Lab), analyzing two water samples collected from Hickory Creek on January 9, 2001, and June 15,

2

2001, as evidence of the current levels of contaminants and metals in Hickory Creek. The Earth Tech study and the Suburban Lab report were submitted to assist IEPA in assessing the impact of the plant's current and expanded discharge on the future water quality of Hickory Creek.

On January 5, 2003, IEPA tentatively decided to grant New Lenox the NPDES permit to increase the level of discharge from its sewage treatment plant into Hickory Creek. Accordingly, pursuant to section 309.109 of Title 35 of the Code (35 Ill. Adm. Code §309.109 (amended at 2 Ill. Reg. 16, eff. April 20, 1978)), IEPA issued a public notice of this decision along with a proposed draft of the permit. IEPA then conducted a public hearing regarding this permit on April 24, 2003, with an IEPA hearing officer and other IEPA representatives present. Mike Turley, the wastewater treatment plant operator for New Lenox, was also present and introduced himself but chose not to comment or question others who spoke publicly during the hearing on the proposed permit. No one spoke on behalf of the Village of New Lenox at this hearing.

However, representatives from the various Environmental Groups attended, voiced their concerns, and presented scientific studies supporting their positions during the public hearing, and requested that the permit, if issued, include or reduce the proposed limits for various contaminants in the effluent discharges. They also requested that IEPA properly analyze whether the increased discharge would further deteriorate the stream's water quality and negatively impact the existing uses of the stream; examine potential alternatives and the costs of eliminating harmful chemicals from the effluent, specifically phosphorus and nitrogen; and require a new and valid survey of the current stream conditions be conducted in accordance with the published IEPA methodology.

Witnesses commented at the public hearing that they already had observed green algal

blooms in Hickory Creek. The Environmental Groups also stressed, during this hearing, that the additional phosphorus and nitrogen discharges in the increased discharges would affect dissolved oxygen concentrations and would cause excessive algal blooms and other unnatural plant growth, which is already affecting the quality of the stream. The IEPA record contains scientific authority and interdepartmental IEPA memoranda invalidating New Lenox's Earth Tech study report challenging the methods and lack of data used to form its conclusions.

After the public hearing, the hearing officer set a 30-day period for further written comments concerning this permit. 35 Ill. Adm. Code §309.117 (filed with Secretary of State January 1, 1978; codified 6 Ill. Reg. 8357). New Lenox did not provide any supplemental written comments to IEPA. The Environmental Groups did tender additional written statements and scientific studies to the IEPA hearing officer during the comment period after the hearing. At the close of the comment period, IEPA granted the NPDES permit to New Lenox on October 31, 2003. The permit as issued, modified only the dissolved oxygen limit based on the public hearing information, but did not address any of the other concerns of the Environmental Groups. Pursuant to section 166.192 of Title 35 of the Code, IEPA issued a 20-page "responsiveness summary," which detailed the basis for IEPA to issue the permit and included the following: records, data, witnesses' comments, criticisms, and suggestions; and IEPA's responses to significant comments. 35 Ill. Adm. Code §166.192 (filed with Secretary of State January 1, 1978; codified 6 Ill. Reg. 8357).

On December 2, 2003, the Environmental Groups filed a petition, pursuant to section 40(e) of the Act (415 ILCS 5/40(e) (West 2002)), requesting the Board to review IEPA's decision to grant the NPDES permit and also to review the terms and conditions of the permit.

4

The Environmental Groups alleged in their petition that the permit, as issued, violated the Act and several Board regulations, including sections 302.203, 302.205, 304.105, and 309.141(d) of Title 35 of the Illinois Administrative Code. 35 Ill. Adm. Code §§ 302.203 (amended at 14 Ill. Reg. 2899, eff. February 13, 1990), 302.205 (amended at 3 Ill. Reg. 20, eff. May 17, 1979), 304.105 (filed with Secretary of State January 1, 1978; codified 6 Ill. Reg. 8357), and 309.141(d) (amended at 27 Ill. Reg. 202, eff. December 20, 2002).

Both IEPA and New Lenox requested additional discovery to be completed prior to the permit appeal hearing. Based upon a telephonic status conference between the Board's hearing officer and the parties, the hearing officer entered orders on March 2, 2004, and April 1, 2004, directing the parties to submit proposed, prehearing, discovery briefing schedules and to address the scope and relevance of any additional requested discovery.

The Environmental Groups objected to the discovery request and argued that the Board should not allow additional discovery because the Act and applicable regulations limited the Board's review to the record IEPA relied upon when making the decision to issue the permit. After several continuances in the proceedings, on February 4, 2005, the Environmental Groups filed a motion for summary judgment on their petition to appeal the issuance of the permit pending before the Board. All parties submitted briefs and arguments supporting their respective positions regarding the Environmental Groups' motion for summary judgment.

The Board denied the Environmental Groups' motion for summary judgment in a 40-page, written order entered on November 17, 2005, which also included the written ruling on the discovery requests. In that order, the Board stated, "Specifically, Section 101.516(b) of the Board's procedural rules provides that, '[i]f the record, including pleadings, depositions, and admissions on file, together with any affidavits, shows that there is no genuine issue of material

5

fact, and that the moving party is entitled to judgment as a matter of law, the Board will enter summary judgment.' 35 Ill. Adm. Code [§]101.516(b)." The hearing officer further stated in that order, "Considering the pleadings strictly against the petitioners [Environmental Groups], the Board cannot conclude that there is no genuine issue of material fact with regard to the issue of nutrient loadings[,] *** the issue of the narrative offensive conditions standard[, and] *** the issue of the copper water quality standard." The Board also denied New Lenox's and IEPA's request for additional discovery, noting that the Act provides that "the hearing will be based exclusively on the record before the Agency [IEPA] at the time the permit or decision was issued." See 415 ILCS 5/40(e)(3) (West 2002).

On April 19, 2007, the Board issued a 51-page opinion and order remanding the permit to IEPA for additional review consistent with their order. The Board stated:

"Clearly, petitioners [Environmental Groups] bear the burden of proof and the Board reviews the record to determine if the issuance of the permit violated the Act or Board regulations. Further the Board reviews the entire record and is not limited to the IEPA's reasoning or facts discussed by the IEPA."

The Board agreed that the Enviromental Groups demonstrated:

"IEPA failed to properly consider the effect of the increased discharge from the New Lenox plant on Hickory Creek. Specifically, the IEPA failed to properly review the increased discharge pursuant to 35 Ill. Adm. Code 302.105(c) and as a result the issuance of the permit violates 35 Ill. Adm. Code 302.105(c) and Section 39 of the Act (415 ILCS 5/39 ([West] 2004))."

The Board noted:

"The record establishes that the increased loading of nutrients may degrade the

6

stream and the IEPA did not consider the impact of increased loading of phosphorus and nitrogen on the receiving stream. Further, the record does not support the IEPA's determinations that the water quality standards for offensive conditions[,] dissolved oxygen, pH, and copper will not be violated based on the increased loading to the stream. The Board also finds that the record does not demonstrate that existing uses will be protected given the increase in discharge to Hickory Creek."

Another Board finding concluded:

"IEPA did not demonstrate that the lowering of water quality of Hickory Creek is necessary to accomplish important economic or social development in the area where the stream is located (*see* 35 Ill. Adm. Code 302.105(c)(1))."

As a result, the Board remanded the permit to IEPA for additional review pursuant to the antidegradation provisions of the Board's rules (35 Ill. Adm. Code §302.105 (amended at 27 Ill. Reg. 166, eff. December 20, 2002)) and consistent with its opinion and order.

IEPA and New Lenox filed motions to reconsider and the Board denied those motions in an order entered on July 12, 2007. As a result, IEPA and New Lenox filed a direct appeal to this court, pursuant to Supreme Court Rule 335 (172 Ill. 2d R. 335), challenging the Board's decision regarding the NPDES permit at issue. Additional facts will be incorporated as necessary in the analysis of the issues below.

## II. ANALYSIS

### A. The Permit Process

IEPA and the Board each have distinct roles in the issuing of NPDES or other permits in Illinois. IEPA is authorized by statute to issue NPDES permits. 415 ILCS 5/39 (West 2002).

7

However, the Board regulates the standards and procedures that must be met before IEPA may approve various permits under the Act. 415 ILCS 5/13(b) (West 2002). Pursuant to this authority under section 13(b) of the Act, the Board has established specific regulations set forth in the Illinois Administrative Code to preserve the integrity of bodies of water in Illinois affected by IEPA's issuance of a NPDES permit. See 35 Ill. Adm. Code §§309.108 (amended at 28 Ill. Reg. 7310, eff. May 7, 2004), 309.109 (amended at 2 Ill. Reg. 16, eff. April 20, 1978), 309.115 (filed with Secretary of State January 1, 1978; codified 6 Ill. Reg. 8357), 309.119 (amended at 28 Ill. Reg. 7310, eff. May 7, 2004); *Prairie Rivers Network v. Pollution Control Board*, 335 Ill. App. 3d 391, 401 (2002).

IEPA must comply with the Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2002)) and the Illinois Pollution Control Board's general water quality regulations (35 Ill. Adm. Code §302.101 *et seq.*) to protect and maintain water quality standards in this state before issuing a NPDES permit. As counsel for IEPA argued before this court, IEPA is essentially the "gatekeeper of assuring clean water in Illinois" by assuring that any permit issued will not cause a violation of the Act or the administrative regulations.

Under section 39(a) of the Act, "[I]t shall be the duty of the [IEPA] to issue such a permit *upon proof by the applicant that the facility,* equipment, vehicle, vessel, or aircraft *will not cause a violation of this Act or of regulations hereunder.*" (Emphasis added.) 415 ILCS 5/39(a) (West 2002). Section 39(b) states IEPA may issue NPDES permits to allow the discharge of contaminants "from point sources into navigable waters." 415 ILCS 5/39(b) (West 2002).

As a further procedure to ensure that IEPA has met its duty to protect water quality, the Act allows interested third parties to appeal the IEPA's issuance of a NPDES permit. Section 40(e)(1) of the Act states, "If [IEPA] grants or denies a permit under subsection (b) of Section 39

8

of this Act, a third party *** may petition the Board within 35 days from the date of issuance of the Agency's decision, for a hearing to contest the decision of the Agency." 415 ILCS 5/40(e)(1) (West 2002). In the instant case, the Environmental Groups properly filed a third party challenge of IEPA's decision to issue the NPDES permit allowing New Lenox to expand the wastewater treatment plant at issue.

### B. Burdens of Proof

#### 1. The permit applicant's burden

IEPA, as gatekeeper, must assure that the impact of a requested permit will not violate the standards of the federal Clean Water Act of 1977 (33 U.S.C. §1251 *et seq.* (2000)) before issuing a NPDES permit. "'Illinois has specific regulations setting forth the procedures [the IEPA] must follow in issuing an NPDES permit. See 35 Ill. Adm. Code [§§] 309.108, 309.109, 309.115, and 309.119.'" *Prairie Rivers Network*, 335 Ill. App. 3d at 401. To comply with these mandates, "[t]he application for an NPDES permit *must* contain sufficient information for the IEPA to determine that the proposed discharge will be in compliance with all State and Federal requirements." (Emphasis added.) *E S G Watts, Inc. v. Pollution Control Board*, 224 Ill. App. 3d 592, 595 (1992), citing 35 Ill. Adm. Code §309.103 (1985). If IEPA does not require this proof from the permit applicant, IEPA has not complied with its own duties under the Act.

#### 2. Enviromental Groups' burden and the scope of the Board's review

It is well settled by the Board and Illinois courts that IEPA's decision to issue a permit must be supported by "substantial evidence." *Prairie Rivers Network v. Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 01-112, at 7 (August 9, 2001) *(Black Beauty Coal)*. Even though a decision to issue a permit by IEPA must be supported by substantial evidence, this does not, however, shift the burden away from the petitioners (Environmental

9

Groups), who alone bear the burden in their appeal before the Board to prove that the permit, as issued, violated either the Act and/or the Board's regulations. 415 ILCS 5/40(e)(3) (West 2002); *Black Beauty Coal*, slip. op. at 7; *Village of Lake Barrington v. Environmental Protection Agency,* Ill. Pollution Control Bd. Op. 05-5, at 5 (April 21, 2005); *E S G Watts, Inc.*, 224 Ill. App. 3d at 595; *Prairie Rivers Network*, 335 Ill. App. 3d at 401.

Importantly, section 40(a)(1) of the Act states:

"If, however, the Agency [IEPA] issues an NPDES permit that imposes limits which are based upon a criterion *** then the Agency [IEPA] shall have the burden of going forward with the basis for the derivation of those limits or criterion which were derived under the Board's rules." 415 ILCS 5/40(a)(1) (West 2002).

Appellants argue that the Board did not require the Environmental Groups to establish with certainty that the permit would violate the Act and Code. Consequently, appellants claim that the Board misapplied the burden of proof by making IEPA justify the terms and conditions incorporated into the permit. We disagree.

The Board must review the entire record relied upon by IEPA to determine whether the third party has shown that IEPA failed to comply with criteria set forth in the applicable statutes and regulations before issuing or denying the NPDES permit. 415 ILCS 5/40(a)(1), (d) (West 2002); *Prairie Rivers Network*, 335 Ill. App. 3d at 401. Here, all parties acknowledge that the Environmental Groups carried the burden before the Board. However, we conclude that the third parties in this case met their burden of proof before the Board by demonstrating that IEPA failed to require sufficient evidence to *assure* the water quality of Hickory Creek would not deteriorate further by exceeding the regulatory narrative and numeric standards as a result of the plant

10

expansion.

### 3.  Appellate standard of review

This court has held that an application for a NPDES permit must contain "sufficient information for the IEPA to determine that the proposed discharge will be in compliance with all State and Federal requirements." *E S G Watts, Inc.*, 224 Ill. App. 3d at 595, citing 35 Ill. Adm. Code §309.103 (1985).  We review the Board's findings and order remanding the permit as issued to IEPA, solely on the evidence in the IEPA record, to determine whether the Board's findings were contrary to the manifest weight of the evidence. *Environmental Protection Agency v. Pollution Control Board*, 115 Ill. 2d 65, 69-70 (1986); 415 ILCS 5/41(b) (West 2006).

This court has observed, "When reviewing a decision of the Illinois Pollution Control Board, the court's function is not to reweigh the evidence or make an independent assessment of the facts." *E S G Watts, Inc. v. Pollution Control Board,* 286 Ill. App. 3d 325, 330 (1997). Therefore, to meet the manifest weight of the evidence standard, the Board's decision will be upheld on appeal when "any evidence in the record fairly supports the action taken by an administrative agency." *E S G  Watts,* 286 Ill. App. 3d at 330, citing *Farmers State Bank of McNabb v. Department of Employment Security*,  216 Ill. App. 3d 633 (1991).  Other Illinois courts have consistently applied this manifest weight of the evidence standard when reviewing Board decisions of permit appeals.  See *Environmental Protection Agency  v. Jersey Sanitation Corp.*, 336 Ill. App. 3d 582, 589 (2003);  *Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board*, 179 Ill. App. 3d 598, 602 (1989);  *Joliet Sand & Gravel Co. v. Pollution Control Board*, 163 Ill. App. 3d 830, 834 (1987).

In this case, the Board found that the Environmental Groups were correct and the record did not contain sufficient evidence to support IEPA's decision that the permit, as issued, would not cause a violation of the Act and Board regulations.  Consequently, we must determine

whether this finding by the Board was supported by the record. *Prairie Rivers Network*, 335 Ill. App. 3d at 401; *Black Beauty Coal*, slip op. at 8; 415 ILCS 5/39(a) (West 2004).

### 4. The Board's Findings

The Board, in its opinion and order, found that IEPA did not receive sufficient data concerning the increased pollutants and consequently did not properly assess the impact of the increased pollutant loading from the expanded plant as required by the Act (415 ILCS 5/1 *et seq.* (West 2004)) and the Illinois Pollution Control Board's regulations (35 Ill. Adm. Code §302.101 *et seq.*). The Board remanded the permit for further analysis of four areas required by the administrative regulations. The remand required the IEPA to conduct an antidegradation assessment that (1) addressed whether the NPDES permit was necessary; (2) assured that the water quality would not be diminished below regulatory standards; (3) protected existing uses of the stream; and (4) considered all technically and economically reasonable measures to avoid or minimize the extent of the pollutant loading on the stream. 35 Ill. Adm. Code §§302.105(a), (c)(1), (c)(2), (f) (amended at 27 Ill. Reg. 166, eff. December 20, 2002).

We will address each concern separately.

### *a. Necessity*

The Board found that the IEPA antidegradation assessment, included in the record, did not demonstrate that the increased loading was "necessary to accommodate important economic or social development" as required by regulations. 35 Ill. Adm. Code §302.105(c)(1) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). In their "responsiveness summary," the Board found that IEPA concluded that the expansion was necessary to accommodate future growth, but the record did not contain data showing that the increased discharge was unavoidable or necessary. The record also did not contain any facts or analyses discussing other feasible alternatives which might negate the

12

necessity of increasing the discharge into Hickory Creek. Nor did the IEPA record contain information that revealed IEPA evaluated the possibility of other methods to eliminate or reduce phosphorus and/or nitrogen from the effluent before discharging the waste water into the stream thereby minimizing harmful pollutants. The Board found that, without this assessment of "necessity" for the increased discharge levels of contaminants, IEPA failed to follow the requirements of section 302.105(c)(1) to determine that important social or economic development *necessitated* lowering the quality of the water. See 35 Ill. Adm. Code §302.105(c)(1) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). We conclude that the Board's finding as to a violation of this section is not contrary to the manifest weight of the evidence.

### b.  Effects of Increased Discharge for
### Phosphorus, Nitrogen, Dissolved Oxygen, pH, and Copper

Sections 302.105(c)(2)(A) and (B)(i) require IEPA to "consider the fate and *effect* of any parameters proposed for an increased pollutant loading" and "*[a]ssure* [that the] applicable numeric or narrative water quality standard will not be exceeded as a result of the proposed activity." (Emphasis added.) 35 Ill. Adm. Code §302.105(c)(2)(A), (c)(2)(B)(i) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). The Board determined the record showed that IEPA issuance of the permit violated section 302.105(c)(2)(B)(i) of Title 35 of the Code because IEPA did not assure that the water quality standards for certain contaminants would not be exceeded as a result of granting the permit for the proposed expansion. 35 Ill. Adm. Code §302.105(c)(2)(B)(i) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). In fact, the Board found that the record showed evidence that the increased loading *would* cause or contribute to violations of the water quality standards for offensive conditions related to phosphorous, nitrogen, dissolved oxygen, pH, and algal bloom levels in the stream.

13

The Board specifically noted that neither New Lenox's application for the permit nor IEPA's antidegradation assessment identified or quantified the potential impacts of the increased phosphorus and nitrogen loading on the stream as required by the regulations. The record contained witness statements and scientific studies that established that there already were algal blooms in Hickory Creek and that increased phosphorus and nitrogen in the discharge could accelerate the numbers of offensive algal blooms and further contribute to violations of those water quality standards. 35 Ill. Adm. Code §302.203 (amended at 14 Ill. Reg. 2899, eff. February 13, 1990).

The Board noted that IEPA listed Hickory Creek on its 2002 list of "impaired streams" for nitrogen, phosphorus, total suspended solids, and other parameters. The Board found the record showed that IEPA did nothing to assess or evaluate the impact of an increased discharge of nutrient loadings on the stream's algal activity to assure the narrative water quality standards could be maintained, thus violating section 302.105(c)(2)(B)(i) of the Code. 35 Ill. Adm. Code §302.105(c)(2)(B)(I) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). Although these algal blooms were already present in Hickory Creek, the Board found that the evidence in record was insufficient to determine whether the blooms resulted from the waste water discharged from the New Lenox plant, or from some other source.

In their antidegradation assessment, IEPA concluded that the expansion *would not* exacerbate the existing algae problems in Hickory Creek due to increased nutrient loading. However, the Board found the record devoid of evidence to support this conclusion. In fact, the Board determined the record contained evidence that the excessive and offensive algal blooms were already present in Hickory Creek and the IEPA permit failed to set *any* limits for phosphorus as established by regulations, which the IEPA record shows, could further enhance

14

the proliferation of algae. 35 Ill. Adm. Code §302.105(c)(2)(B)(i) (amended at 27 Ill. Reg. 166, eff. December 20, 2002).

The Board noted the IEPA antidegradation assessment indicated IEPA declined to develop specific restricted limits for the nutrient loading in the discharge because "development for water quality standards for nutrients is progressing as fast as resources allow and research is being conducted." IEPA indicated that the "standards for phosphorus sources could be another four or five years away" but "standards for phosphorus will be adopted once the basic nature of phosphorus in various streams is understood." Emphasizing that Hickory Creek phosphorus and nitrogen levels must be assessed by IEPA, the Board rejected these findings that limits for phosphorus and nitrogen could not be accurately delineated within the permit. In fact, section 302.205 of Title 35 of the Code already designated a limit for phosphorus concentrations. 35 Ill. Adm. Code §302.205 (amended at 3 Ill. Reg. 20, eff. May 17, 1979).

Moreover, the Board found the record showed that the concentrations of dissolved oxygen and pH can be directly related to concentrations of algal blooms in a stream. The Board determined that, although IEPA established effluent limits for dissolved oxygen and pH in the proposed permit based upon the current discharge rate, the record showed no evidence that IEPA considered the effects of the additional nutrient loading from the increased discharge allowed by the new permit to assure that the numeric standards for dissolved oxygen and pH would not be exceeded. Therefore, the Board found the permit, as issued, did not assure that the increased discharge would not result in violations of the dissolved oxygen or pH standards in violation of section 302.105(c)(2)(B)(i). 35 Ill. Adm. Code §302.105(c)(2)(B)(i) (amended at 27 Ill. Reg. 166, eff. December 20, 2002).

The IEPA record includes a report from Suburban Laboratories, Inc, which relied on data

15

from two water samples from Hickory Creek, collected on January 9, 2001, and June 15, 2001, to determine average concentrations for copper in the stream. IEPA determined that permit limits for copper were not necessary because the *average* copper level of these two samples was substantially less than the regulation's maximum or chronic water quality standard for copper. 35 Ill. Adm. Code §302.208 (amended at 27 Ill. Reg. 166, eff. December 20, 2002). IEPA concluded that the increased discharge of wastewater would not cause the chronic standards for copper limits in Hickory Creek to be exceeded. Without determining the source of the copper concentrations in the water samples, IEPA concluded that New Lenox's plant was a low risk for high levels of metal concentrations because "wastewater treatment plants generally do not discharge metal concentrations and because New Lenox has no known source of copper."

The Board expressed concern that IEPA relied on limited copper sampling data, especially when one sample contained copper levels approximately equaling the maximum copper water quality standard. The Board noted that the record showed IEPA did not use the United States Environmental Protection Agency (USEPA) method for evaluating the reasonable potential to exceed water quality standards for copper because that method called for using more than two samples. The Board found that the evidence in the record showed that IEPA reached its conclusion that the New Lenox plant would not discharge excessive copper concentrations without first acquiring adequate water samples or performing a proper "reasonable potential analysis." In fact, the Board further concluded that, applying the USEPA reasonable potential analysis to the two water samples collected, the results indicated a reasonable potential to exceed the chronic water quality standard for copper. 35 Ill. Adm. Code §302.208 (amended at 27 Ill. Reg. 166, eff. December 20, 2002).

The record showed that increased nutrient loading generally would affect the numeric

16

water quality standards for phosphorus, nitrogen, dissolved oxygen, and pH and could affect the narrative quality standards for algae. The record also showed that one of the two water samples tested for copper was already very close to equaling the chronic standard without determining the source of these high copper concentrations. Noting that the IEPA antidegradation assessment did not address the increased discharge by predicting how the increased discharge would affect these standards set by regulations, the Board concluded the gathering of data during the permit process was incomplete. Thus, the Board concluded that IEPA did not have "sufficient information" to determine that the numeric and narrative water quality standards would not be violated with the expansion of the wastewater treatment plant. Based upon these findings, the Board determined that this permit, as issued, violated sections 302.105(c)(2)(A) and 302.105(c)(2)(B)(i) of Title 35 of the Code. 35 Ill. Adm. Code §§302.105(c)(2)(A), (c)(2)(B)(i) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). We conclude that the Board's findings in this regard were not against the manifest weight of the evidence.

### c. Existing Uses

The Board noted, on page 38 of its order, "that one of the most important tenets of the antidegradation regulations is the protection of the existing uses of all waters of the State." The Code requires that, before IEPA issues a permit allowing increased discharge, IEPA must assure that all existing uses of the stream are both maintained and protected. 35 Ill. Adm. Code §§302.105(a), (c)(2)(B)(ii) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). The Board specifically found the record lacked evidence assessing how the increased discharge of effluent from the water treatment plant would maintain and protect the existing uses of the stream, including the aquatic life in the stream.

Bob Mosher, an IEPA "Water Quality Standards Unit" employee supporting the issuance

17

of the permit, commented at the public hearing about the IEPA antidegradation assessment, stating:

>  "We relied on really two main pieces of information, one of which was the 2002 [Earth Tech] macroinvertebrate [insect] study sponsored by the Village [New Lenox]. That study indicated that there wasn't an impact to macroinvertebrates downstream of the existing New Lenox plant versus upstream."

He also said the other piece of information they relied upon was from the IEPA biologist who made the decision to put Hickory Creek on the list of impaired streams in 2002.

The record shows, through copies of IEPA interoffice memoranda, that this Earth Tech study was highly criticized internally by other IEPA employees. One memorandum stated that the collection methods used by Earth Tech were not in compliance with the IEPA 1994 "Quality Assurance and Field Methods Manual," thus making it "difficult to judge the validity of the Earth Tech study." The memo further stated that Earth Tech used different collection methods, different taxon tolerant values, and different criteria for interpreting "MBI" (macroinvertebrate biotic index) scores from those typically used by IEPA, and the report did not contain enough specific information on "habitat, water chemistry, and flow." Another memorandum concerning the Earth Tech study stated:

> "The macroinvertebrate memo prepared by Earth Tech is one of the poorest studies I have seen in a while. They did not follow IEPA collection methodology and they used a combination of Hillsenhoff (1987) tolerances (0-10 scale) and IEPA family level tolerances (0-11 scale). They identified organisms down to the genus level so they should have used IEPA genera tolerances."

Some of these memoranda also recommended that IEPA require Earth Tech to conduct a new

study in compliance with IEPA standards and methodology.

In spite of this evidence in the record, IEPA relied heavily on this questionably invalid and unreliable Earth Tech study. Other than the limited Earth Tech macroinvertebrate study of insects, the Board found that the IEPA record did not contain evidence of any current study of the existing aquatic communities or how the increased discharge will affect those communities. The Board noted that the record contained evidence that Hickory Creek supported a "diverse assemblage of fish species," but nothing in the record demonstrated that the aquatic wildlife of Hickory Creek would not be harmed by this increase in nutrient loading in the creek.

In respect to the existing uses issue, the Board found IEPA violated sections 302.105(a) and 302.105(c)(2)(B)(ii) of Title 35 of the Code. 35 Ill. Adm. Code §§302.105(a), (c)(2)(B)(ii) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). Based upon our review of the record, this finding was not contrary to the manifest weight of the evidence.

### d. Reasonable Measures

The Board further found that the regulations required that the IEPA antidegradation assessment must assure that "[a]ll technically and economically reasonable alternatives are incorporated into the proposed expansion to avoid or minimize the proposed increase of pollutant loading into a stream." See 35 Ill. Adm. Code §302.105(c)(2)(B)(iii) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). Although the record shows that IEPA considered one general cost estimate to show the feasibility of using a land management program as an alternative to expanding the present wastewater treatment plant, this cost estimate was a part of the discredited Earth Tech study.

Furthermore, a witness at the public hearing presented evidence that the costs for a land management plant, rather than a wastewater treatment system, would be similar to those

19

associated with the expansion of the wastewater plant. The Board found that record and the IEPA assessment did not address any other alternatives or technologies to minimize the increased pollutant loading into Hickory Creek. Additionally, the Board stated that nothing in the record showed that IEPA considered the costs or technology available to remove phosphorus and nitrogen from the effluent before it was discharged into Hickory Creek or even addressed any other alternatives. As a result, the Board found that IEPA issued the permit in violation of section 302.105(c)(2)(B)(iii) of Title 35 of the Code. 35 Il. Adm. Code §302.105(c)(2)(B)(iii) (amended at 27 Ill. Reg. 166, eff. December 20, 2002). Based upon our review of the record, we determine that this finding of the Board was not against the manifest weight of the evidence.

As to all of these issues, the Board found the Environmental Groups sustained their burden of proof during the hearing demonstrating that the permit, as issued, violated the aforementioned sections of the regulations and, consequently, section 39 of the Act. 415 ILCS 5/39 (West 2004). Based on our careful review of the record, we conclude that none of the Board's findings were contrary to the manifest weight of the evidence.

### III. New Lenox's Discovery Requests and Due Process

The applicable standard of review for rulings on discovery issues is the abuse of discretion standard. *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 457 (2006). It should be noted that only New Lenox has raised this issue on appeal to this court. Denying appellants' request for discovery, the Board found that the Act and the Board's procedural rules mandated the Board to conduct the permit appeal hearing "exclusively on the record before the Agency [IEPA] at the time the permit or decision was issued." 415 ILCS 5/40(e)(3) (West 2006); 35 Ill. Adm. Code §105.214(a) (amended at 29 Ill. Reg. 8811, eff. June 8, 2005). Therefore, we agree the Board could not properly consider additional evidence or testimony that might be disclosed through

20

additional discovery, and conclude the Board did not abuse its discretion in denying the requests for additional discovery. See *Alton Packaging Corp. v. Pollution Control Board,* 162 Ill. App. 3d 731, 738-739 (1987).

### IV. Summary Judgment Ruling and the Final Order

Appellants contend that the Board's denial of the Environmental Groups' motion for summary judgment is inconsistent with the ultimate conclusions in its final 51-page opinion and order. Since the Board did not grant summary judgment in favor of the Environmental Groups, and it did not receive additional evidence during the administrative hearing on the permit appeal, appellants contend the Environmental Groups could not have met their burden of proof. We conclude that appellants' position that a ruling on summary judgment should predict the outcome of the hearing on the merits of a case is erroneous.

The Code details the legal standard the Board must use in motions for summary judgment by stating:

> "If the record, including pleadings, depositions and admissions on file, together
> with any affidavits, shows that there is no genuine issue of material fact, and that
> the moving party is entitled to judgment as a matter of law, the Board will enter
> summary judgment." 35 Ill. Adm. Code §101.516 (filed with Secretary of State
> January 1, 1978; codified 6 Ill. Reg. 8357).

This is the same standard used in trial court proceedings in Illinois. See 735 ILCS 5/2-1005(c) (West 2006); *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 483 (1998).

When ruling on a motion for summary judgment, pleadings, depositions, and affidavits must be considered "strictly against the movant and in favor of the opposing party." *Dowd*, 181 Ill. 2d at 483. The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine question of material fact exists. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007). Our supreme court has held:

21

"Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt." *Bagent*, 224 Ill. 2d at 163.

The Board applied these standards and denied the motion for summary judgment finding that, upon considering the record and pleadings strictly against the Environmental Groups and in favor of IEPA and New Lenox, there existed genuine issues of material fact regarding the issues of nutrient loading, the narrative offensive conditions water quality standard, and the copper water quality standard. We agree that the motion for summary judgment was properly denied by the Board.

Where summary judgment is denied, the case proceeds to a hearing and a final judgment on the merits of the case and questions of fact must be resolved by the Board. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board,* 225 Ill. 2d 103, 118 (2007). The Act states, "After due consideration of the written and oral statements, the testimony and arguments that shall be submitted at the hearing, *** the Board shall issue and enter such final order, or make such final determination, as it shall deem appropriate under the circumstances." 415 ILCS 5/33(a) (West 2006). A final judgment has been defined as "a determination by the court on the issues presented by the pleadings which ascertains and fixes absolutely and finally the rights of the parties in the lawsuit." *Flores v. Dugan*, 91 Ill. 2d 108, 112 (1982). At the final hearing on the merits, the Board is not called upon to review the evidence in a light most favorable to either party, but must balance and weigh the evidence in a neutral context to make its final determination or judgment.

In the instant case, the Board had very different legal standards to apply when ruling on the motion for summary judgment and deciding the merits of the case. In making its final determinations in its opinion and order, the Board resolved the questions of material fact based upon the evidence in the record. Therefore, we conclude that the Board's decision to deny summary judgment in favor of the Environmental Groups was not irreconcilable with its final

22

decision to negate IEPA's issuance of the New Lenox permit and remand it for further evaluation.

## V. CONCLUSION

After conducting a thorough and independent review of the record, we conclude there is substantial evidence in the IEPA record illustrating that IEPA neglected to properly consider the regulatory standards prohibiting the degradation of Illinois waters set forth in section 302.105 of Title 35 of the Code. 35 Ill. Adm. Code §302.105 (amended at 27 Ill. Reg. 166, eff. December 20, 2002). Therefore, the record supports the action taken by the Board to remand the permit back to IEPA for further review of those standards. We further find that the Board's decision denying discovery in the instant case was not an abuse of discretion. Finally, the Board's ruling on summary judgment was not inconsistent with its ruling on the merits of the case. For the reasons stated, we affirm the Pollution Control Board's decision.

Affirmed.

CARTER and SCHMIDT, JJ., concur.