# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Toyal America, Inc. v. Illinois Pollution Control Board*, 2012 IL App (3d) 100585

---

| | |
|---|---|
| Appellate Court Caption | TOYAL AMERICA, INC., f/k/a Alcan-Toyo America, Inc., Petitioner, v. ILLINOIS POLLUTION CONTROL BOARD and THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* LISA MADIGAN, Attorney General State of Illinois, Respondents. |
| District & No. | Third District<br>Docket No. 3-10-0585 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | December 13, 2011<br><br>February 3, 2012<br>February 3, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The civil penalty imposed on petitioner by the Pollution Control Board in the amount of $716,440 for violating regulations promulgated pursuant to the federal Clean Air Act pertaining to emissions of volatile organic material was upheld where the penalty was not arbitrary, capricious or unreasonable and it was supported by section 42(h) of the Environmental Protection Act and was within the range set forth in section 42(a). |
| Decision Under Review | Petition for review of order of Pollution Control Board, No. 00-211. |
| Judgment | Affirmed. |

Counsel on Appeal      John Simon (argued) and Roy M. Harsch, both of Drinker, Biddle & Reath, LLP, of Chicago, for petitioner.

Lisa Madigan, Attorney General, of Chicago (Christopher M.R. Turner (argued), Assistant Attorney General, of counsel), for respondents.

Panel      JUSTICE McDADE delivered the judgment of the court, with opinion. Justices Carter and Wright concurred in the judgment and opinion.

## OPINION

¶ 1      Petitioner, Toyal America, Inc., appeals from an order entered by the Illinois Pollution Control Board (Board). Petitioner maintains that the Board erred when it entered a $716,440 civil penalty against petitioner. We affirm.

¶ 2                          FACTS

¶ 3      Petitioner is part of the Toyal Group of companies, a global leader in the manufacturing of aluminum powders and advanced aluminum pigments for applications in automotive and industrial coating markets. The Toyal facility at issue in this case (the facility) is located in Chicago's ozone nonattainment area. Petitioner has operated the facility since 1996.

¶ 4      Pursuant to the federal Clean Air Act (CAA) (42 U.S.C. § 7401 *et seq.* (2006)), the Board developed and promulgated regulations requiring facilities in the Chicago nonattainment area that had the potential to emit at least 25 tons of volatile organic material (VOM) per year to control and reduce their VOM emissions by at least 81%. See 35 Ill. Adm. Code 218.986(a) (2012). This specific regulation became effective March 15, 1995. From March 15, 1995 until April 2003, petitioner operated the facility in violation of section 218.986(a).

¶ 5                      Violations

¶ 6      In February 1992, the Illinois Environmental Protection Agency (IEPA) requested information from petitioner regarding the VOM emissions at the facility. Petitioner reported maximum theoretical VOM emissions of 82 tons, though it stated that it considered its practical emissions to be 41.5 tons per year. Defendant further reported actual VOM emissions of 28.07 tons in 1990 and 33.61 tons in 1991. Because its emissions were in excess of 25 tons per year, defendant was subject to the VOM control requirements found in section 218.986(a). See 35 Ill. Adm. Code 218.986(a) (2012).

¶ 7      After operating out of compliance for almost a year, petitioner submitted a Clear Air Act Permit Program (CAAPP) application to the IEPA in March 1996. In its application,

petitioner admitted that its emission units were not in compliance with section 218.986(a); however, it represented that it would install control equipment and demonstrate compliance by November 1998.

¶ 8    In January 1997, petitioner hired a consultant to assist in evaluating its VOM sources. The next month, petitioner sought internal company approval to investigate control technology to comply with the VOM standards. Petitioner subsequently submitted a construction permit application to the IEPA in late May 1998 to install and use a recuperative catalytic oxidizer (RCO) unit to control emissions.

¶ 9    Petitioner began construction of the RCO in September 1998. The RCO became operational on December 1, 1998. Although petitioner had scheduled a stack test with the IEPA on December 30, 1998, petitioner canceled the test after it learned that the RCO would not demonstrate compliance. Petitioner requested a new stack test on February 29, 1999. Petitioner did not conduct the February 1999 test, nor did it conduct any other test for over four more years. Instead, petitioner continued to operate the facility in violation of section 218.986(a).

¶ 10    In April 2001, petitioner submitted a construction permit application to the IEPA, which proposed construction of new VOM control equipment at the facility. The application also included a separate plan for expansion of the facility as a whole. This separate plan included an expansion of the facility's production units. The capital cost of the expansion was between $5 million and $6 million.

¶ 11    As to that portion of the application concerning the new VOM equipment, petitioner reported that seven separate processing units at the facility, consisting of 83 separate emission sources, were not in compliance with the applicable VOM emissions regulations. Petitioner's application explained that it would control its VOM emissions with a regenerative thermal oxidizer (RTO), rather than the RCO. Petitioner advised the IEPA that it would test the RTO for compliance in May 2002. On February 19, 2002, however, petitioner requested an extension of the RTO construction permit and again sought to delay the date for demonstrating compliance. Although it received another extension, petitioner never purchased the RTO equipment.

¶ 12    In 2002, petitioner again sought an extension of the compliance test. At this time, petitioner acknowledged that, prior to 2002, "it had internal management issues that caused friction between the IEPA and [itself]." Petitioner also acknowledged that it "did not understand the [compliance] problem enough to resolve it." The briefs are unclear whether petitioner was granted another extension.

¶ 13    In late 2002, petitioner informed the IEPA that it had abandoned the RTO proposal and instead would use a "modified" RCO to control its VOM emissions. Petitioner's "modified" RCO plan involved using the same RCO unit it had purchased in 1998, but connecting it to more of the facility's VOM emission sources. On April 23, 2003, petitioner demonstrated compliance with section 218.986(a).

¶ 14    In July 2005, petitioner replaced its "modified" RCO system with a catalytic recuperative oxidizer (CRO) unit. Petitioner purchased the CRO, in part, because the RCO unit caused periodic shutdowns and interruptions in production. In addition, the CRO unit increased the

efficiency of the facility. Petitioner was able to arrange for permitting, construction, and operation of the CRO unit within one year.

¶ 15                              Enforcement Proceedings

¶ 16    In May 2000, the State filed a seven-count complaint against petitioner with the Board. Count I of the complaint alleged that petitioner failed to control its VOM emissions in violation of section 218.986(a) (35 Ill. Adm. Code 218.986(a) (2012)). Count II alleged that, as a result of its failure to control its VOM emissions according to industry standards, petitioner caused, allowed, or threatened air pollution in violation of section 9(a) of the Environmental Protection Act (Act) (415 ILCS 5/9(a) (West 2008)).[1]

¶ 17    An administrative hearing was held before a Board hearing officer on the complaint. At the hearing, petitioner did not dispute that it violated section 218.986(a) or section 9(a). Instead, the hearing merely addressed the parties' dispute over the appropriate penalty for petitioner's noncompliance during the eight-year period.

¶ 18    The State called Gary Styzens as its economic benefit analysis expert. Styzens is employed in the IEPA's finance and administration section as its economic benefit analyst and financial analyst. He is a certified internal auditor who has 25 years of experience in internal auditing. Styzens estimated that the total economic benefit that petitioner accrued as a result of its noncompliance with section 218.986(a) was $316,449. Styzens explained that analysis of an economic benefit is done on a case-by-case basis, to determine how a noncompliant entity had a financial advantage by delaying or avoiding capital expenditures during a noncompliance period, which provided the entity with an opportunity to invest in other areas besides environmental compliance.

¶ 19    In computing petitioner's total economic benefit, Styzen split the noncompliance period into two distinct terms (Phase I and Phase II) to reflect petitioner's two-phased approach to achieving compliance.

         "1. Phase 1 Non-compliance period March 15, 1995 through December 31, 1998

         $33,642 in economic benefit associated with the delay in capital expenditures during Phase 1.

         $162, 911 in economic benefit associated with annual avoided capital/operating expenditures during Phase 1.

         2. Phase 1 [*sic*] non-compliance period March 15, 1995 through February 28, 2003

         $75,056 in economic benefit associated with the delay in capital expenditures during Phase 2.

         $19,157 in economic benefit associated with additional annual avoided capital/operating expenditures during Phase 2.

         3. Phase 1 and 2 Delayed Penalty Payment period from February 28, 2003 through December 31, 2005

---

[1]The parties entered into a settlement agreement on the remaining five counts.

$25,674 in economic benefit from interest/investment earnings for the delay in payment of the economic benefit penalty for phases 1 and 2.

Total economic benefit estimate for 1) through 3) above is $316,440 ($33,642 + $162,911 + $75,056 + $19,157 + $25, 674)."[2]

¶ 20    Petitioner called Christopher McClure as its economic benefit expert. Like Styzens, McClure also employed a delaying or avoiding capital expenditures analysis to determine petitioner's economic benefit. McClure acknowledged that Styzens' analysis was "generally correct." McClure estimated that the abstract economic benefit that accrued to petitioner from noncompliance with section 218.986(a) was $292,371.

¶ 21    McClure, however, reduced petitioner's economic benefit by over $1 million in "potential cost savings" from solvent recovery that he claimed petitioner would have enjoyed if it had timely complied in 1995. McClure explained that petitioner, upon gaining compliance, discovered "a specific side effect" of the RCO system that resulted in improved recovery of solvent used in the operation of the facility. Specifically, when petitioner hooked up its VOM emission sources to the "modified" RCO unit in 2003 (when it attained compliance), it also connected its solvent distillation unit to the RCO.[3] According to petitioner, connecting the solvent unit to the RCO allowed it to "bubble air" into a separate clean tank, enabling petitioner to recover used solvent. In light of petitioner's postcompliance cost savings, McClure opined that if petitioner had complied with the VOM emissions regulation in 1995, it would have enjoyed approximately $1 million in cost savings from increased solvent recovery.

¶ 22    McClure asserted that the United States Environmental Protection Agency's BEN User's Manual (the BEN Manual) instructed that such forgone benefits from timely compliance should offset whatever economic benefits were otherwise attributed to a violating entity. Relying upon the BEN Manual, McClure concluded that petitioner enjoyed no economic benefit from delayed compliance.

¶ 23    Styzen disputed McClure's forgone-benefit theory, explaining that he had never seen a case where it was appropriate to reduce the economic benefit by such theoretical savings. He testified that the United States Environmental Protection Agency developed and used the BEN Manual to calculate settlements for violations of federal environmental statutes, not to calculate penalties in litigation. He has never used the BEN manual to calculate penalties in litigation. Styzen explained that providing a rebate in circumstances such as in the instant case would undermine the deterrence purpose of the economic benefit penalty because entities that fail to comply with regulations could face no penalty for the economic benefits they gained due to their noncompliance.

¶ 24    At the start of the hearing, the State moved to exclude a supplemental opinion by McClure and any related testimony to further reduce the economic benefit. The basis for this motion to exclude was that two days prior to the administrative hearing, petitioner served the

---

[2]Quoted from the Board's order.

[3]As early as 1996, the facility had a distillation unit that was recovering solvent.

State with the supplemental report, which argued that petitioner's economic benefit from noncompliance also should be offset by costs associated with petitioner's purchase of a vacuum chiller unit in 2001. In its April 2001 permit application for the facility expansion and the proposed RTO system, petitioner also sought to install a vacuum chiller unit. Petitioner's 2001 application reflected that the company intended to connect the unit to VOM sources. Ultimately, petitioner never installed the unit and admitted that its purchase was "absolutely" a mistake.

¶ 25    After oral argument, the hearing officer held that McClure's supplemental opinion constituted unfair surprise. The officer granted the State's motion to exclude, but accepted the supplemental report and related testimony as an offer of proof. After the hearing, the hearing officer issued a written report confirming his decision to exclude the opinion though accepting it as an offer of proof. In posthearing briefing, the State reasserted its objection to McClure's supplemental opinion and testimony on the issue.

¶ 26                                      The Board's Order

¶ 27    The Board found that petitioner committed the violations alleged in the State's complaint. The Board affirmed the hearing officer's evidentiary ruling that McClure's supplemental opinion on the vacuum chiller unit constituted unfair surprise. Accordingly, the Board refused to consider the exhibits and testimony regarding the vacuum chiller.

¶ 28    The Board then considered the factors set forth in section 33(c) and 42(h) of the Act in determining whether a civil penalty was warranted and, if so, what amount was reasonable (415 ILCS 5/33(c), 42(h) (West 2008)). With regard to section 33(c), the Board found that the character and degree of injury and the technical and economic practicality of compliance warranted the imposition of a monetary penalty. The Board noted that although the facility's social and economic value, its suitability for its location and petitioner's eventual compliance weighed in petitioner's favor, the contravening factors necessitated a monetary penalty.

¶ 29    The Board then considered section 42(h) to determine the appropriate amount of the penalty. The Board found that the duration and gravity of petitioner's violations, petitioner's lack of due diligence over the eight-year period, its economic benefit from noncompliance, and the need for adequate deterrence supported the imposition of a substantial penalty.

¶ 30    The Board also found that the economic benefit estimate proposed by Styzen was more credible than McClure's estimate. Noting that each expert derived similar calculations, the Board found that petitioner all but admitted the credibility of Styzen's figures. The only critical difference was McClure's contention that petitioner's economic benefit from noncompliance should be offset by approximately $1 million of financial benefits from solvent recovery, which McClure asserted petitioner would have enjoyed if it had timely complied with section 218.986 in March 1995. Citing its prior decision in *People v. Panhandle Eastern Pipe Line Co.*, Ill. Pollution Control Bd. Op. 99-191, at 31-32 (Nov. 15, 2001), the Board rejected McClure's forgone-benefit theory. The Board noted that acceptance of such a theory could possibly reward violators for failing to meet their legal obligations.

¶ 31    The Board acknowledged that petitioner's prior settlement of its other violations was a

mitigating factor; however, it did not afford it much weight. The Board found that petitioner's disclosure of its violations in its CAAPP application was a neutral factor. The Board also found that petitioner's postcompliance work (replacement of its RCO unit with the CRO) was inapplicable.

¶ 32    Ultimately, the Board imposed a $716,440 civil penalty, consisting of petitioner's $316,440 economic benefit plus $50,000 for each year (8) of its noncompliance ($50,000 x 8 = $400,000). The Board also ordered that petitioner cease and desist from any future violations. One of the Board's five members dissented, arguing that while a monetary penalty was appropriate, he believed that the penalty imposed was excessive. Petitioner now appeals.

¶ 33                              ANALYSIS

¶ 34    Petitioner does not challenge the Board's holding that petitioner failed to control its VOM emissions in violation of section 218.986(a) and as a result of its failure caused, allowed, or threatened air pollution in violation of section 9(a) of the Act. Instead, petitioner alleges only that the civil penalty imposed against it was excessive. Specifically, petitioner argues that the Board "misconstrued" sections 33(c) and 42(h) of the Act. Petitioner also argues that the economic benefit component of the penalty should be offset by over $1 million in "potential cost savings" from solvent recovery that it allegedly would have enjoyed if it had timely complied in 1995.

¶ 35    Upon review, we hold the Board's factual findings, with regard to the factors espoused in sections 33(c) and 42(h), were not contrary to the manifest weight of the evidence. Moreover, we find the Board's discretionary decision to impose a $716,400 civil penalty was not clearly arbitrary, capricious or unreasonable.

¶ 36                         Standard of Review

¶ 37    A dual standard of review applies with respect to the Board's decision imposing a $716,400 civil penalty upon petitioner. This court has expressly recognized that "[w]hen reviewing a decision of the *** Board, the court's function is not to reweigh the evidence or make an independent assessment of the facts." *Illinois Environmental Protection Agency v. Illinois Pollution Control Board*, 386 Ill. App. 3d 375, 383 (2008) (quoting *ESG Watts, Inc. v. Pollution Control Board*, 286 Ill. App. 3d 325, 330 (1997)). Instead, we review the Board's factual findings solely on the evidence in the record, to determine whether the factual findings were contrary to the manifest weight of the evidence. *Illinois Environmental Protection Agency*, 386 Ill. App. 3d at 383. This court has also observed, however, that the Board is vested with broad discretionary powers in imposing penalties upon a violating entity. *City of Morris v. Community Landfill Co.*, 2011 IL App (3d) 090847, ¶ 42. "A penalty will be set aside if it is clearly arbitrary, capricious or unreasonable." *City of Morris*, 2011 IL App (3d) 090847, ¶ 42.

¶ 38                            Section 33(c)

¶ 39    Initially, petitioner contends that the Board "misconstrued" section 33(c) of the Act.

Section 33(c) provides:

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source; and

(v) any subsequent compliance." 415 ILCS 5/33(c) (West 2008).

¶ 40    The Board found the first factor, the character and degree of injury to or interference with the protection of the health, general welfare, and physical property of the people, weighed against petitioner. The record supports this finding. The Board noted that Will County has been designated a ozone nonattainment area in an attempt to improve ozone air quality in the greater Chicago area. Petitioner does not challenge the Board's finding that it failed to control its VOM emissions in violation of section 218.986(a) and as a result of its failure caused, allowed, or threatened air pollution in violation of section 9(a) of the Act. This fact alone supports the Board's finding as to this factor.

¶ 41    The Board found the second factor, the social and economic value of the pollution source, generally weighed in favor of petitioner. We agree. Eighty-nine people are employed by petitioner at the facility. Clearly, this fact establishes some social/economic value. We note, however, that the Board expressly found this value was "considerably undercut during the eight-year period of VOM noncompliance by a business located in what was, at all pertinent times, a severe ozone non-attainment area." Nothing in the record refutes this specific factual finding.

¶ 42    The Board found the third factor, the suitability or unsuitability of the pollution source to the area in which it is located, weighed "slightly" in petitioner's favor. The basis for the Board only attributing slight weight to this factor was again because it found that petitioner's eight years of noncompliance undercut the degree of weight that could otherwise be afforded this factor. Again, nothing in the record refutes this specific factual finding.

¶ 43    The Board found the fourth factor, the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source, weighed against petitioner. The record supports this finding. Initially, we note that it took petitioner eight years to attain compliance. The Board, however, when amending section 218.986(a), expressly concluded that "these requirements are technically feasible and economically reasonable." With respect to petitioner, the Board found that petitioner did not rely on novel technology to attain compliance in 2003. The technology used to connect the RCO unit with emission sources to attain compliance was

available in the early 1990's. Moreover, the technology was not economically unreasonable. The Board found that Phase I expenditures totaled $781,129 and Phase II expenditures totaled $470,887. The Board noted that if plaintiff was unable to attain compliance it could have requested a variance from the Board. It also noted the fact that when petitioner replaced its "modified" RCO system in 2005, it was able to arrange for permitting, construction, and operation of the new CRO system within one year.

¶ 44 The Board found the fifth factor, any subsequent compliance, weighed in favor of petitioner. We agree, as petitioner attained compliance in 2003.

¶ 45 In light of the above facts, we cannot say that the Board's decision to impose a civil penalty was clearly arbitrary, capricious or unreasonable. Like the Board, we stress the long duration of petitioner's violations. Moreover, we are troubled by the fact that petitioner canceled numerous regulatory tests over the eight-year period. Instead of cancelling tests, petitioner could have sought regulatory relief from the Board. While we, like the Board, acknowledge that the "suitability" and "social/economic value factors" weigh in favor of petitioner, we agree with the Board's conclusion that these factors are undercut by the length and degree of petitioner's violations. We also agree with the Board's determination that it was technically feasible and economically reasonable for petitioner to achieve compliance. Lastly, while petitioner did attain compliance in 2003 this fact does not excuse petitioner's previous eight years of noncompliance.

¶ 46                                                    Section 42(h)

¶ 47 Upon determining that a civil penalty was warranted, the Board reviewed section 42(h) of the Act, which petitioner argues it also "misconstrued." Section 42(h) lists a number of factors that the Board is to consider when determining the appropriate penalty, including:

"(1) the duration and gravity of the violation;

(2) the presence or absence of due diligence on the part of the [entity] in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom as provided by this Act;

(3) any economic benefits accrued by the [entity] because of delay in compliance with requirements, in which case the economic benefits shall be determined by the lowest cost alternative for achieving compliance;

(4) the amount of monetary penalty which will serve to deter further violations by the [entity] and to otherwise aid in enhancing voluntary compliance with this Act by the [entity] and other persons similarly subject to the Act;

(5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the respondent;

(6) whether the [entity] voluntarily self-disclosed, in accordance with subsection (i) of this Section, the non-compliance to the Agency; and

(7) whether the [entity] has agreed to undertake a 'supplemental environmental project,' which means an environmentally beneficial project that a [entity] agrees to undertake in settlement of an enforcement action brought under this Act, but which the

[entity] is not otherwise legally required to perform." 415 ILCS 5/42(h) (West 2010). Section 42(h) also states:

> "In determining the appropriate civil penalty to be imposed ***, the Board shall ensure, in all cases, that the penalty is at least as great as the economic benefits, if any, accrued by the respondent as a result of the violation, unless the Board finds that imposition of such penalty would result in an arbitrary or unreasonable financial hardship." 415 ILCS 5/42(h) (West 2010).

¶ 48    The Board found the first factor, the duration and gravity of the violation, "aggravates [petitioner's] violation and warrants a substantial penalty." The record supports this finding. Petitioner's violations were ongoing for eight years. Petitioner was fully aware of its violations throughout the eight-year period. From March 15, 1995 through December 1, 1998, petitioner operated no control equipment to reduce its VOM emissions into the ozone noncompliance area. While the Board acknowledged that there may have been some emission reductions once the RCO was installed, the record is clear that uncontrolled VOM emissions still continued as it took petitioner over five years from the installation of the original RCO to gain compliance. At no time did petitioner cease operations to control VOM emissions or seek regulatory relief.

¶ 49    The Board found the second factor, the presence or absence of due diligence on the part of the entity in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom, "aggravates the violation[ ] and warrants a substantial penalty. The record supports this finding. The Board correctly points out that it was petitioner's obligation to determine what VOM requirements applied to it and to timely achieve compliance or seek regulatory relief. Petitioner did neither. Instead, petitioner jumped from one solution to another, only to abandon certain solutions before even implementing them. While it appears that petitioner was having some internal management issues as to how to handle the VOM emissions issue, it is apparent that petitioner was able to plan, execute and pay for a major expansion of the facility at a capital cost of $5 million to $6 million. Also significant is the fact that after petitioner attained compliance, it was able to arrange for permitting, construction, and operation of the CRO unit within one year. We agree with the Board's conclusion that VOM compliance took a back seat to other business considerations.

¶ 50    As to the third factor, any economic benefits accrued by the entity because of delay in compliance, the Board found that petitioner accrued a $316,440 economic benefit as a result of its failure to comply. The amount of $316,440 was based on Styzens' economic calculations, which the Board found credible. We find no reason to disturb the Board's credibility finding. The Board correctly noted that McClure all but admitted the credibility of Styzens' figures. The only significant challenge posed by McClure concerning Styzens' figures involved the forgone-benefit theory.[4]

---

[4]To the extent that petitioner challenges Styzens' estimate on the grounds that he did not factor in the vacuum chiller unit that petitioner purchased but never installed, we note that the Board affirmed the hearing officer's evidentiary ruling on the vacuum chiller unit issue. Petitioner has

¶ 51    Petitioner believes that the BEN Manual requires that a violating entity be allowed to offset its economic benefits. In support of this belief, petitioner cites to chapter 4, section 7, of the BEN Manual, which states, in pertinent part:

"ISSUES THAT ARISE WITH BEN        CHAPTER 4

* * *

7. Compliance is 'Cheaper' than Noncompliance

The violator comes into compliance late and finds that it has been saving money since it installed the new technology. This may occur because the compliant technology allows the violator to recover materials and/or reduce operation and maintenance costs. BEN produces a negative result."

¶ 52    In rejecting petitioner's reliance on chapter 4, section 7, of the BEN Manual, the Board explained that allowing a violating entity to offset its economic benefits would undermine the deterrence purpose of the economic benefit penalty because entities that fail to comply with regulations could face no penalty for the economic benefits they gained due to their non-compliance.[5] We agree with this reasoning. More importantly, however, we note that chapter 4 of the BEN Manual merely identifies "ISSUES THAT ARISE WITH BEN." It does not expressly provide that a violating entity be allowed to offset its economic benefits. Finally, we note that "the BEN Manual is not binding upon the Board." *People v. Packaging Personified, Inc.*, Ill. Pollution Control Bd. Op. 04-16, at 37 (Sept. 8, 2011).

¶ 53    The Board found the fourth factor, the amount of monetary penalty which will serve to deter further violations by the entity and to otherwise aid in enhancing voluntary compliance, to be an "aggravating factor." The record supports this finding. The Board initially noted that VOM standards are constantly being tightened at both the state and federal level in an effort to reach ozone attainment. The Board explained that sources that become newly subject to VOM regulations must be deterred from relying on the Board to notify them that they are subject to rules. We not only agree, but add that it is imperative that a violating entity, who has failed to comply with regulations for eight years, be held accountable for its actions, or lack thereof. Failure to do so would not only defeat the purpose of the Act, but would also likely result in more entities avoiding compliance due to the fact there would be no consequences to their actions.

¶ 54    The Board found the fifth factor, the number, proximity in time, and gravity of previously adjudicated violations of this Act by the entity, as a slightly mitigating factor. The Board's basis for its finding was that petitioner settled the remaining five violations/counts prior to the hearing before the hearing officer. While we would have considered the five other violations/counts against petitioner had we been in the Board's position, we defer to the Board's finding as to this factor.

¶ 55    The Board found the sixth factor, whether the entity voluntarily self-disclosed, weighed

_____

failed to directly challenge this holding. Thus, we deem the issue waived.

[5]In support of this holding, the Board cited one of its previous decisions, *People v. Panhandle Eastern Pipeline Co.*, Ill. Pollution Control Bd. Op. 99-191 (Nov. 15, 2011).

"neither for nor against [petitioner]." The Board noted that its finding was based upon petitioner's own suggestion. We defer to the Board's finding as to this factor.

¶ 56 The Board found the seventh factor, whether the entity has agreed to undertake a "supplemental environmental project," inapplicable due to the fact that the parties did not agree to a settlement within the meaning of section 42(h)(7). We agree.

¶ 57 Upon reviewing its factual findings related to section 42(h), the Board imposed a total civil penalty of $716,400, consisting of $316,440 in cost to be recovered for economic benefits petitioner received through noncompliance, and an additional $400,000 ($50,000 per year of violation) under section 42(a) of the Act. Section 42(a) provides that any person who violates "any provision of th[e] Act or any regulation adopted by the Board *** shall be liable for a civil penalty *** not to exceed $50,000 for the violation and an additional civil penalty *** not to exceed $10,000 for each day during which the violation continues." 415 ILCS 5/42(a) (West 2010). In assessing its penalty, the Board noted that the maximum possible penalty under section 42(a) was $59,820,000 (two separate violations for 2,986 days). The Board also noted the fact that the State waived any award of attorney fees. It also reviewed the penalty in light of its previous decisions and general penalty authority.

¶ 58 In light of these facts, we find that the Board's penalty was not arbitrary, capricious or unreasonable. Instead, the penalty was supported by section 42(h), including the mandate that penalties be at least as great as the economic benefits accrued by the respondent as a result of the violation. Moreover, the penalty is well within the range provided for in section 42(a).

¶ 59 For the foregoing reasons, we affirm the Board's order imposing a $716,440 civil penalty on petitioner.

¶ 60 Affirmed.